STATE of Minnesota, Respondent,

v.

Jeffrey Bill LEWIS, Appellant.

STATE of Minnesota, Respondent,

v.

Jerry Bill LEWIS, Appellant.

Nos. 48311, 48312.

Supreme Court of Minnesota.

Sept. 15, 1978.

Rehearing Denied Nov. 6, 1978.

Thomson & Nordby, St. Paul, for appellants.

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., Craig Forsman, Sp. Asst. Atty. Gen., St. Paul, William R. Glaeser, County Atty., Chaska, for respondent.

Heard before PETERSON, TODD and GODFREY, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

Defendants Jeffrey and Jerry Lewis were convicted of felony possession of a controlled substance with intent to distribute in violation of Minn.St. 152.09, subd. 1(1), and 152.15, subd. 1(2). On appeal from the judgments, defendants raise issues concerning (1) disclosure of the identity of a confidential informant; (2) constitutionality of entry upon defendants' premises to place them under arrest; (3) validity of a search warrant; and (4) scope of the search warrant.

Defendants were arrested the evening of Sunday, January 18, 1976. The nature of the issues, including probable cause for arrest, necessitate a rather detailed statement of the facts. The events began Saturday, the day before defendants' arrest, when Sergeant Milton Shoquist of the Austin, Texas, police department received a telephone call from a confidential informant. The informant told Shoquist that 2 days earlier, Thursday, a man named Roberto Herrera had delivered 600 pounds of marijuana from the Corpus Christi area to Johnston, Texas (a small community northwest of Austin). In Johnston, according to the informant, the marijuana was transferred from Herrera's vehicle to a pickup truck operated by a man named "Ronnie," who left Texas on Friday to deliver the marijuana to the home of one Jeff Lewis in Chaska, Minnesota. The informant did not know Ronnie's last name or the license number of his pickup truck. But the informant did tell Shoquist that Ronnie's pickup had Texas license plates and a camper shell over the truck bed, that the marijuana would be concealed in the back of the pickup, and that Ronnie would be accompanied by his wife, Brenda, and their small child. The informant also provided Shoquist with a telephone number for the Lewis residence and specific road directions for reaching it. Finally, the informant also told Shoquist that Roberto Herrera, the man who had provided the marijuana to Ronnie for transportation to Minnesota, would soon be leaving the Austin, Texas, area and flying via Braniff Airlines to Minneapolis-St. Paul to meet Jeff Lewis and obtain payment for the marijuana.

After receiving this information from the informant, Sergeant Shoquist located a photograph of Roberto Herrera in Austin police files, supplied it to Austin airport security personnel, and asked that he be contacted if Herrera purchased an airline ticket. That same Saturday, Shoquist telephoned Richard Irwin, an agent of the Drug Enforcement Agency (DEA), who was also located in Austin, Texas, and gave him the information provided by the informant. Agent Irwin relayed the information to Jerry Kraemer, a DEA agent working in Minneapolis. Following these contacts, investigative work continued in both Texas and Minnesota.

In Minnesota Agent Kraemer began checking DEA files for references to a Jeff Lewis. He found references to defendants in connection with "drug related activity" in Mankato, Minnesota, in 1971. A DEA check of the phone number provided by the informant disclosed that it was listed to a Jerry Lewis in Chaska, Minnesota. About 4:30 that Saturday afternoon, Kraemer and another agent followed the directions provided by Sergeant Shoquist and located a house in a semirural part of Chaska which fit the described directions. They established surveillance of the house, which was defendants' residence, and remained there until approximately midnight Saturday, when they left.

At about 6 a. m. the next morning (Sunday), Agent Kraemer and others reestablished surveillance at the Lewis residence. They remained there until about 1 p. m., when they left for Minneapolis-St. Paul International Airport, because they had received information from Texas that, as ex-

pected, Roberto Herrera had left Austin on a Braniff flight and would be arriving in Minneapolis-St. Paul at 2:30 p. m. Based upon a description, the agents recognized a man they believed to be Herrera at the arrival gate of the Braniff flight. They followed him to a motel and observed him register there as Roberto Herrera.

At this point the focus of events shifted back to the Lewis residence. At about 6:30 p. m. (several hours after Herrera had arrived in Minneapolis), DEA Agent John O'Connor drove his pickup truck with a shell camper to the mouth of the Lewis driveway. He pulled onto the driveway and was turning around to leave when he saw someone open the front door of the house. Simultaneously, a light outside the house flashed on and off "a number of times, as if signaling." O'Connor also saw someone at a window who was looking out at him. He completed his turn in the Lewis driveway and then returned to a surveillance position near the Lewis residence.

About 9:15 that evening Agent O'Connor saw a truck with Texas license plates and more than one occupant in the cab drive past him, turn onto the Lewis driveway, and pull up close to the Lewis house. O'Connor left his surveillance position and drove past the Lewis residence. As he was driving past, he saw the figures walk from the truck to the Lewis house. A short time later he saw two figures emerge from the house, walk to the rear of the recently arrived truck, and shine a flashlight inside the camper shell. When the two figures returned from the pickup to the house, O'Connor radioed for local police and sheriff's deputies to come to the area, and then he left the area to meet with an assistant county attorney and apply for a warrant to search the Lewis premises. It should be noted that at this point there were four vehicles on the Lewis driveway: The pickup with Texas license plates, another pickup belonging to defendant Jerry Lewis, and two automobiles.

At 10:30 or 10:40 p. m., about an hour after Agent O'Connor left to obtain a search warrant, Agent Kraemer observed the garage door at the Lewis residence open and the garage light come on. Kraemer then saw two adult figures in the driveway and another automobile inside the garage. The automobile moved out of the garage onto the driveway. At about the same time, the two pickup trucks and one of the automobiles already on the driveway began to move.

Immediately after observing these movements on the driveway, the agents and officers left their surveillance positions and approached the Lewis driveway to place the persons there under arrest.[1] Defendant Jeffrey Lewis, Ronald Sherrill (the "Ronnie" who had driven the pickup from Texas), and Jeanette Erickson were arrested while standing on the driveway. As other officers took charge of these persons, Agent Kraemer walked to the automobile which had just emerged from the garage and stopped about 3 feet from the edge of the house. As he walked to the automobile, Kraemer passed a large window through which he saw a woman inside the house and a large quantity of marijuana plants on the kitchen table.[2]

From the automobile on the driveway, Agent Kraemer proceeded to the door between the inside of the garage and the house. When a woman (apparently Brenda Sherrill) came to the door, Kraemer identified himself, presented his credentials, and asked if anyone else was inside. The woman replied that only she and her child were in the house. Kraemer and another agent then entered and placed the woman under arrest; inside they also found and arrested defendant Jerry Lewis.

1. Agent Kraemer testified at defendants' omnibus hearing that the officers and agents moved in to make the arrests before Agent O'Connor had returned with the search warrant, because they believed contraband was being taken from the premises, probably to Herrera.

2. The record contains as exhibits two photographs of an extremely large quantity of marijuana plants stacked on the kitchen table. Agent Kraemer testified that the photographs depicted the marijuana as he later found it inside the house and approximately as it looked to him through the window.

At this point other agents entered the house and brought with them the persons arrested on the driveway. Those arrested were advised of their rights and then, except for defendant Jerry Lewis, were taken to the county jail. Agent Kraemer and several other agents remained in the house with Jerry Lewis to await Agent O'Connor's return with the search warrant. During this time the inside of the house was not searched, although the agents and officers did determine that no one else was in or around the house.

Outside the house, an agent inspected the exterior of the Texas pickup truck. Upon shining his flashlight through the rear door of its camper shell, the agent observed numerous packages about 2 by 4 by 12 inches in size, which were wrapped in foil. The agent entered the camper and found that the foil packages contained marijuana. This information was radioed to Agent O'Connor, who was then applying for a search warrant.

Sometime between midnight and 1 a. m., a search warrant was issued to Agent O'Connor, who then returned to the Lewis residence, advised defendant Jerry Lewis of the warrant, and directed a search of the house. The search of the house revealed a large quantity of marijuana and a bag containing a large amount of currency. A search was also made (after the arrival of the warrant) of defendant Jerry Lewis' pickup truck. Inside the truck, a suitcase was found containing currency and 1 to 2 ounces of marijuana.

Following their arrest, defendants were charged with possession of marijuana with intent to sell. At an omnibus hearing on the charge, the district court denied their motion to suppress the evidence resulting from the search and seizure. Defendants subsequently waived a jury trial and were tried to the court and convicted.

■ 1. The first issue raised by defendants concerns the identity of Sergeant Shoquist's informant. Prior to the omnibus hearing, defendants signed affidavits which stated without elaboration that the existence of an informant was "totally fabricat-ed" by the prosecution. These affidavits by defendants were the only purported evidence at the omnibus hearing which contradicted Shoquist's testimony that a confidential informant, who had acquired information "on a first hand basis," was the source of the information given to the Minnesota authorities. The hearing judge accepted Shoquist's testimony and denied defendants' requests for disclosure of the informant's identity.

On appeal defendants argue, relying principally on *State v. Luciow*, 308 Minn. 7, 240 N.W.2d 833 (1976), that the hearing judge's refusal to compel disclosure of the putative informant's identity unfairly hindered their efforts to show that the police and Federal agents acted without probable cause. The factual situation in this case, however, is significantly different from that presented in Luciow.

In Luciow, a confidential informant provided information to a police officer. The officer used the information in applying for a search warrant and stated in his affidavit that the informant had provided reliable information in the past. Luciow presented as a witness his longtime girl friend who testified (1) that she was the informant and had supplied the officer with information in a fit of jealous anger, and (2) that she had never previously supplied the officer with information. We found that this evidence was sufficient to seriously challenge the officer's statement in the affidavit that his confidential informant had been reliable in the past. Therefore, we held that Luciow was "entitled to some form of disclosure of the informant's identity if he can establish that such disclosure is necessary to complete his evidentiary attack on the supporting affidavit." 308 Minn. 13, 240 N.W.2d 839.

In the present case, defendants' attack is directed not at the informant's past reliability, but at the informant's very existence. In support of this broad attack, defendants offer nothing more than their own conclusionary affidavits which, of course, were not subject to cross-examination and do not approach the evidentiary showing made by

the defendant in Luciow. In this case the hearing judge was entitled to credit Sergeant Shoquist's testimony over defendants' affidavits, especially since the totality of the evidence strongly indicated that the police and Federal agents were acting on information from an informant. We find no error in the hearing judge's refusal to require disclosure of the informant's identity.

2. We turn next to defendants' argument that the officers and agents violated the Fourth Amendment because they acted without a search warrant in entering the driveway and the house to arrest defendants. We find that the warrantless entry and arrest were constitutionally permissible. There was, as a matter of fact, no search of defendants' home until after the arrival of a search warrant.

■ The officers' and agents' initial entry onto the driveway falls well within our holding in State v. Crea, 305 Minn. 342, 233 N.W.2d 736 (1975).[3] The warrantless arrests made on the driveway were constitutionally valid because they were based on probable cause to believe that those arrested had committed a felony. It is true that probable cause derived initially from an informer whose identity was unknown to the Minnesota officers and agents. But the informant, according to Sergeant Shoquist's testimony at the omnibus hearing, had acquired the information on a "first hand basis." Moreover, the information was detailed, and its reliability was extensively corroborated by the events observed by Minnesota authorities prior to any arrests. Thus the informant's information, as corroborated by observations in Minnesota prior to any arrests, satisfied the requirements of directness and reliability necessary to establish probable cause. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). See, also, Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

■ It was following these arrests in the driveway that Agent Kraemer looked into the house window and observed in plain view (1) a large stack of marijuana plants on the kitchen table and (2) a woman standing inside the house looking out toward the driveway. If further facts were necessary, these observations, coupled with the previously existing circumstances, clearly provided probable cause for Kraemer to arrest the woman looking through the window and anyone else he found in the house.

■ Minn.St. 629.34(3) specifically authorizes officers with probable cause to enter a dwelling house to make a felony arrest after announcing their office and purpose. The statute does not contravene the Fourth Amendment because it authorizes entry for purposes of a valid arrest, not entry for purposes of a warrantless search. Where there is compliance with the statute, we have upheld police entry into a dwelling to make arrests in circumstances closely analogous to those of the present case. State v. Clark, Minn., 250 N.W.2d 199 (1977). Once the arrests were made, the officers and agents waited on the scene with defendant Jeffrey Lewis until Agent O'Connor returned with the search warrant, and it was not until this point in time that the house and Jerry Lewis' pickup truck were searched.

3. Defendants next challenge the validity of the search warrant. When Agent O'Connor left to obtain a search warrant, he maintained radio contact with the officers and agents on the scene and was informed of the subsequent developments at the Lewis residence before he completed the search warrant application. Thus in obtaining the warrant, O'Connor did not rely on the information from the Texas informant or his observations during the

---

**3.** In State v. Crea, 305 Minn. 342, 233 N.W.2d 736 (1975), we held that when police went to a house to question a suspect the Fourth Amendment did not require a warrant for them to enter the areas of a home's curtilage, such as the driveway, sidewalk, and porch, which are impliedly open to the public. We also held that in the circumstances of that case there was no Fourth Amendment violation in police examining two snowmobile trailers they observed on the driveway and then shining a flashlight through a basement window to see the stolen snowmobiles which were the subject of their investigation.

surveillance period. Instead, O'Connor's affidavit recited the more recent events concerning the arrests on the driveway, the seizure of the foil packages in the Texas pickup truck, and Agent Kraemer's observation through the house window of marijuana on the kitchen table. Defendants contend that the search warrant issued on the basis of this information was invalid, because the seizure of the marijuana packages in the Texas pickup and Kraemer's observation through the window violated the Fourth Amendment.

█ We find no impropriety in either the seizure of the marijuana packages from the Texas pickup or Agent Kraemer's observations through the window. The officers and agents had probable cause to believe there were large quantities of marijuana in the Texas pickup. When an agent directed his flashlight through the rear door of the pickup's camper shell and saw brick-like foil packages in plain view, the only reasonable conclusion he could draw under the circumstances was that the packages contained contraband. Thus the agent was entitled to seize the packages as evidence in plain view. *State v. Houff,* 309 Minn. 1, 243 N.W.2d 129 (1976). Kraemer's observation of marijuana on the kitchen table, as previously noted, clearly comes within the plain view rule as it was applied in *State v. Crea,* 305 Minn. 342, 233 N.W.2d 736 (1975). Since there was no constitutional violation as to either the seizure of the foil packages or Kraemer's observations, they could properly serve as the basis for issuance of the search warrant.

█ 4. The final issue concerns the scope of the search warrant, which defendants argue did not authorize the search of Jerry Lewis' pickup truck located on the house's driveway. The places to be searched were described in the warrant as follows:

"Route 1, Box 129A, a split level dwelling house located approximately three-fourths of a mile south of State Highway 5 and approximately one-half of a mile west of State Highway 41 on West 82nd Street, *and curtilage.*" (Italics supplied.)

We hold that the driveway to a house is part of its curtilage for purposes of executing a search warrant. *United States v. Napoli,* 530 F.2d 1198 (5 Cir. 1976). Since the Lewis pickup truck was on the curtilage of the house it was within the scope of the warrant.

Affirmed.