STATE of Minnesota, Respondent,

v.

Javaris Eugene MILTON, Appellant.

No. A11–0809.

Supreme Court of Minnesota.

Sept. 19, 2012.

Lori Swanson, Attorney General, Saint Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for respondent.

David Merchant, Chief State Appellate Public Defender, Steven P. Russett, Assistant State Public Defender, Saint Paul, MN, for appellant.

OPINION

ANDERSON, PAUL H., Justice.

On February 1, 2011, the Hennepin County District Court convicted Javaris

Eugene Milton of one count of first-degree felony murder and one count of attempted first-degree felony murder. The court then sentenced Milton to: (1) life imprisonment with the possibility of parole for the murder of Dontae Johnson, and (2) a concurrent sentence of 220 months for the attempted murder of C.W. On appeal, Milton makes the following three arguments: (1) the district court erred by not suppressing shell casings seized from the back stairway of Milton's multifamily residence, (2) the State committed prosecutorial misconduct when it referenced shell casings found in Milton's truck, and (3) the district court erred when it failed to give an accomplice liability instruction. Milton asserts that because of the court's errors and the State's misconduct, we must reverse his convictions and grant a new trial. We affirm Milton's convictions.

On the evening of January 2, 2010, Minneapolis police officers responded to a 911 call from a woman who said she heard gunshots fired near her home, which home is located near the intersection of North Sixth Street and Dowling Avenue in north Minneapolis. The woman later testified that she heard five to seven gunshots and then seconds later heard a motor vehicle drive away. The woman testified that when she looked out the window of her home, she saw a body lying next to a van on North Sixth Street.

The police were dispatched to the scene of the reported shooting. As the police arrived at the scene, a man named C.W. walked toward them with his hands in the air. C.W. said to the police, "I think my friend's been shot; a guy just robbed us and he was real close and he started shooting off. . . ." The police placed C.W. in the back of a squad car and began to investigate the crime scene.

At the crime scene, the police found Dontae Johnson lying face down in the snow, next to the passenger side of a van parked on North Sixth Street. Johnson died from multiple gunshot wounds.[1] Johnson's keys were near his body, and the police found $3,365 in Johnson's pants pockets and $1,560 in his wallet. On the ground near the driver's side of the van, the police found four 9 mm Luger shell casings. The police also searched the van and found marijuana in the van. After investigating the crime scene, the police returned to the squad car where C.W. was seated. C.W. told the police, and later testified at trial, about the events that led up to Johnson's death.

C.W. stated that on the evening of January 2, 2010, Johnson drove Johnson's wife's van to pick up C.W. at his home. The two men had "[n]o plans in particular" that evening, but eventually Johnson drove to and parked on North Sixth Street between Dowling Avenue and 39th Avenue. Johnson told C.W. that he planned to "sell some weed to [his] cousin," and then Johnson used his cell phone, apparently to arrange the sale. After waiting a few minutes, Johnson looked in the rearview mirror and recognized his "cousin's truck going the opposite way up the hill." At that point, Johnson made another call on his cell phone. C.W. assumed Johnson was calling his cousin. Johnson told the person on the phone, "I'm on the other block. . . . [Y]ou're going the opposite way to me." Shortly after Johnson's call, C.W. noticed a car pull up behind the van and park, and then a truck pull up near the van and park.

1. While the record indicates that Johnson was likely shot near the driver's side of the van, the record also indicates that Johnson attempted to escape by crawling toward the passenger side of the van, where he died.

After the truck parked, a person stepped out of the truck and approached the driver's side of the van. C.W. was unable to discern the person's identity because the van's windows were fogged due to the cold weather. The person stopped at the driver's side window and spoke with Johnson. C.W. heard Johnson tell the person, "Other side, Cousin." Instead of moving to the other side of the van, the person opened the sliding door on the driver's side and got into the backseat. At this point, C.W. observed that the person was a man dressed in black—including a black-hooded sweatshirt, black jeans, and a black mask. C.W. also noticed that the person held a gun in his left hand. The person put the gun to the back of Johnson's head. Then, with his right hand, the person took a second gun from his right pocket, pointed it at C.W., and said, "Give me the weed."

Johnson responded by saying, "Cousin's going to rob me; Cousin's going to rob me for my weed, going to rob your own family, your own blood . . . ." Johnson then tossed a Tupperware container of marijuana toward the person in the backseat. The person continued to make demands, saying, "[G]ive me the money and the car keys." Johnson responded by again referring to the person as "Cousin." Johnson then removed his seatbelt, turned off the van's engine, opened his door, and stepped out of the van. The person in the backseat also got out of the van, and Johnson and the person stood "face to face." C.W. heard Johnson say, "You going to shoot me, too, Cousin; you going to shoot your own family?"

The next thing that C.W. heard was gunshots. After hearing the gunshots, C.W. removed his seatbelt, "jumped out of the [van]," and began running in a northerly direction. As he ran, C.W. looked back toward the van. When he looked back, he saw the person dressed in black standing near the front hood of the van, shooting in C.W.'s direction.

*The Police Investigation*

The morning after the shooting, the police obtained Johnson's cell phone records. The records indicated that Johnson received six calls from one number and made one call to the same number shortly before the shooting. All of these calls "bounc[ed] off the same [cell phone] tower" near the vicinity of the shooting. The police learned that the number associated with the calls corresponded to a cell phone owned by a T.S., who is also known by the name T.C. The police also learned that T.C. and the appellant, Javaris Eugene Milton, are brothers, and that Milton used T.C.'s cell phone on occasion.

Believing that Milton might have information about Johnson's murder, the police officers investigating the shooting asked the Violent Crimes Apprehension Team (VCA Team) to locate Milton. The VCA Team had "[v]ery few details" about the crime, except that "it was a shooting." Following the investigating officers' request for assistance, several members of the VCA Team went to Milton's home, which was located in an upper-level unit of a duplex on Hillside Avenue North in Minneapolis. Some members of the VCA Team went to the front door of the duplex. Officer Ann Martin said that she went to the back of the duplex "in case anybody came running out the door."[2] While Martin was at the back of the duplex, she noticed two shell casings. One shell casing was located on the platform of a stairway

2. According to Martin, it is a common practice for the VCA team to place officers at the back of a residence.

leading to Milton's back door, and the other shell casing was located further up that stairway. Even though she did not have a search warrant, Martin took possession of the shell casings.

The VCA Team members knocked on the front door of the duplex. Milton answered. The VCA Team members asked Milton to accompany them to the police station to talk to the officers investigating a homicide. Milton was cooperative and agreed to accompany the officers to the police station. The VCA Team members then drove Milton, unhandcuffed, to the police station, where he spoke with the police. During this interview, Milton denied knowing anything about Johnson's murder. When asked about the shell casings on his back stairway, Milton claimed that his downstairs neighbor had shot a gun on New Year's Eve. Milton left the police station after the interview.

Subsequently, the Minneapolis Police Crime Lab determined that the shell casings found on the back stairway of the duplex where Milton lived were 9 mm Luger casings and had been fired from the same gun as the shell casings found at the crime scene. Additionally, the record indicates that at some point during the investigation, the police recovered two shell casings in Milton's truck that presented characteristics consistent with being fired from the same gun used at the crime scene.

After the police received this additional information, they requested a second interview with Milton on January 7, 2010. Milton agreed to the interview and again denied knowing anything about Johnson's murder. About halfway through the interview, the police arrested Milton. The next day, Milton's brother T.C. called one of the officers investigating the shooting and asked if he could speak with the officer to "set the record straight." During the subsequent interview, T.C. told the police that he had been present at the crime scene with Milton and two of Milton's friends. T.C. told the police that it was one of Milton's friends who had exited Milton's truck, approached the van, and apparently began shooting.

The police interviewed Milton a third time that same day. Milton admitted to being present at the crime scene, but claimed that an unknown individual, who had been picked up in Milton's truck on the way to meet Johnson, had shot Johnson. Milton also told the police that another individual who had remained in the truck had a gun and that that individual shot his gun from inside the truck, leaving the shell casings the police found in Milton's truck.

After the third interview with Milton, the police questioned T.C. again. This time T.C. told the police that Milton was responsible for the shooting and denied that the men had picked up an unknown individual. T.C. said that once the men parked near Johnson's van, Milton got out of his truck, approached the van, and got into the van. T.C. said that while he did not actually see Milton shoot Johnson, he saw Milton shoot at C.W. Finally, T.C. said that after the shooting, Milton and the other men from Milton's truck began picking up items off the ground near the van and then returned to Milton's truck with those items, including a Tupperware container of marijuana.[3]

---

3. T.C. was later arrested for aiding an offender, but the district court eventually granted T.C. immunity in exchange for his testimony against Milton. At trial, T.C. testified to the same version of events as he described to the police in his interview. T.C. also testified that Milton had used T.C.'s cell phone to arrange a marijuana sale with Johnson.

The police then interviewed Milton for a fourth time. During his third and fourth interviews, Milton's account of the events surrounding Johnson's murder changed several times. Ultimately, Milton claimed that he, T.C., C.M.—also known as Tre–Deuce—and a fourth individual made "fake" money on the day of Johnson's murder. After making the fake money, the men decided to meet up with Johnson. The men apparently intended to rob Johnson by buying marijuana from him with the fake money. Milton said that he drove the men in his truck to meet Johnson, and that at some point Tre–Deuce's younger brother joined them. Milton told the police that after the men met up with Johnson, Tre–Deuce and Tre–Deuce's younger brother shot Johnson and then shot at C.W. as C.W. ran away. Milton also told the police that it was Tre–Deuce, and not Milton's downstairs neighbor, who shot the gun on New Year's Eve outside Milton's duplex, leaving the shell casings that Officer Martin found at the duplex. After Milton's fourth interview, the police executed a search warrant at Milton's home. During this search, the police found a black skull cap which is also known as a "du rag"[4], as well as notebooks of handwritten rap lyrics that described murdering people with two guns.

*The Trial*

The State charged Milton with first- and second-degree murder, and a grand jury later indicted Milton on two counts of first-degree felony murder: (1) the intentional killing of Johnson while committing or attempting to commit aggravated robbery under Minn.Stat. § 609.185(a)(3) (2010), and (2) the attempted intentional killing of C.W. while committing or attempting to commit aggravated robbery under Minn.

Stat. §§ 609.17 (2010), 609.185(a)(3), and 609.05 (2010). The State also charged Milton as an accomplice with regard to both offenses under Minn.Stat. 609.05. During pretrial proceedings, Milton moved to suppress the shell casings found on the back stairs of his duplex. The district court denied Milton's motion, finding that Officer Martin was lawfully at the duplex and that the shell casings were in plain view of Martin.

During these pretrial proceedings, the State agreed not to introduce the shell casings found in Milton's truck, citing a potential Confrontation Clause problem because the police officer who found the shell casings in the truck was deceased. Despite this agreement, the State referred to the shell casings found in Milton's truck in its opening statement at Milton's trial. Milton did not object to this reference, but later moved to redact all future references to the shell casings found in his truck. The district court granted Milton's motion and directed the State to redact all references to the shell casings found in the truck from any evidence the State intended to introduce. The court then denied a subsequent request by Milton for a mistrial. Later in the trial, the State introduced into evidence a recorded statement made by Milton to the police. In this statement, Milton referenced the shell casings found in his truck. Milton did not object to the State's playing of the recorded statement for the jury.

Near the close of trial, the district court instructed the jury on the elements of first-degree felony murder. The court told the jury that a successful charge of first-degree felony murder required a finding that "Milton, acting alone or intentionally aiding, advising, hiring, counseling, or

**4.** The police testified at trial that they confiscated the black skull cap or "du rag" because C.W. told them the shooter "was wearing a black skully or skull cap at the time of the shooting."

conspiring with others, caused the death of [Johnson], with the intent to effect the death of [Johnson] or another while committing or attempting to commit the crime of aggravated robbery." The court then described the elements of first-degree felony murder and attempted first-degree felony murder, but the court did not give a separate accomplice liability instruction or define "intentionally." After the court instructed the jury, the State argued in its closing argument that Milton was guilty of Johnson's murder either as a principal or as an accomplice.

After a few hours of deliberations, the jury made two requests addressed to the district court: (1) to listen to Milton's recorded statement again, and (2) for a "legal definition of aid and [aided]" and "clarification on intent." The court replayed Milton's statement but declined to give the jury further instructions, stating, "[T]he lawyers and I have determined that the instructions you have been given contain all the laws necessary for you [to] decide this case." The jury then continued deliberations into the next day and ultimately found Milton guilty of first-degree felony murder and attempted first-degree felony murder. The court later convicted Milton of both offenses and sentenced him to concurrent prison terms of life and 220 months.

Milton appeals and requests a new trial. On appeal, Milton makes the following three arguments: (1) the district court erred by not suppressing the shell casings seized from the back stairway of Milton's residence, (2) the State committed prosecutorial misconduct when it referenced the shell casings found in Milton's truck, and (3) the district court erred when it failed to give an accomplice liability instruction.

## I.

We begin our analysis with Milton's argument that the district court erred

when it refused to suppress the shell casings seized from the back stairway of the duplex where Milton lived. The court concluded that the shell casings were admissible because Officer Martin's seizure of the shell casings—while warrantless—satisfied the plain-view exception to the search warrant requirement. Milton argues that the seizure does not fall under the plain-view exception for two reasons. First, Milton argues that the State did not prove that Martin was legitimately in a position to view the shell casings because the stairway is within the duplex's protected curtilage. Second, Milton argues that the State did not prove that the incriminating nature of the shell casings was immediately apparent.

When reviewing a pretrial order on a motion to suppress, we review the district court's factual findings under our clearly erroneous standard. *State v. Ortega*, 770 N.W.2d 145, 149 (Minn.2009). We review the district court's legal determinations, including a determination of probable cause, de novo. *State v. Diede*, 795 N.W.2d 836, 849 (Minn.2011); *State v. Bradford*, 618 N.W.2d 782, 794 (Minn. 2000).

Both the United States Constitution and the Minnesota Constitution guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *accord* Minn. Const. art. I, § 10; *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *State v. Licari*, 659 N.W.2d 243, 250 (Minn.2003). We have said that a warrantless seizure is "presumptively unreasonable unless one of 'a few specifically established and well-delineated exceptions' applies." *Licari*, 659 N.W.2d at 250 (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19

L.Ed.2d 576 (1967)). Here, Officer Martin seized the shell casings at the duplex without a warrant. Thus, unless the seizure satisfies one of the exceptions to the presumptive rule against warrantless seizures, the shell casings cannot be admitted as evidence against Milton at his trial. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *State v. Mathison*, 263 N.W.2d 61, 63 (Minn.1978). The State bears the burden of proving any exception. *Licari*, 659 N.W.2d at 250.

■ One such exception is the plain-view doctrine. *See State v. Zanter*, 535 N.W.2d 624, 631 (Minn.1995). Under the plain-view doctrine, the "police may, without a warrant, seize an object they believe to be the fruit or instrumentality of a crime" as long as three criteria are met: "(1) [the] police are legitimately in the position from which they view the object; (2) they have a lawful right of access to the object; and (3) the object's incriminating nature is immediately apparent." *Id.* (citations omitted) (internal quotation marks omitted). Milton challenges the district court's analysis of the first and third criteria. We will consider each of Milton's arguments in turn.

■■ First, we consider whether Officer Martin was in a legitimate position to view the shell casings when she first saw them. We have said that the constitutional "protections against unreasonable search and seizures extend to the curtilage of a home." *State v. Sorenson*, 441 N.W.2d 455, 458 (Minn.1989). Accordingly, the police generally may not search curtilage without a warrant. The United States Supreme Court has explained that courts determine whether an area constitutes curtilage, "as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Oliver v.*

*United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). Still, what constitutes curtilage often "defies precise definition." *Sorenson*, 441 N.W.2d at 458. Thus, we have sought guidance from the Supreme Court and we · have described curtilage in our case law as the Court has described it—"the 'area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life.'" *Id.* at 458 (quoting *Oliver*, 466 U.S. at 180, 104 S.Ct. 1735). Because curtilage is "so immediately and intimately connected to the home," a resident has a reasonable expectation of privacy in the curtilage of his home. *Garza v. State*, 632 N.W.2d 633, 639 (Minn.2001).

■ But, a resident of a multifamily residence has a "diminished" expectation of privacy in the common areas surrounding the residence. *See State v. Krech*, 403 N.W.2d 634, 637 (Minn.1987) (discussing the backyard of a duplex in a suburban neighborhood). More specifically, we have explained that this "diminished" expectation of privacy in the common areas of multifamily residences is due to the fact that the common areas are " 'not subject to the exclusive control of one tenant and [are] utilized by tenants generally and the numerous visitors attracted to a multiple-occupancy building.'" *Id.* at 637 (quoting 1 W. LaFave, *Search and Seizure* § 2.3(f) at 414 (1987)); *see also United States v. Brooks*, 645 F.3d 971, 975–76 (8th Cir. 2011) (holding that a stairway leading to a common area of a multifamily residence was not curtilage). Thus, if the stairway and platform on which Officer Martin found the shell casings constitute a common area, those areas are not curtilage, and Martin was in a legitimate position when she viewed the shell casings.

Officer Martin testified at a pretrial hearing that upon arriving at Milton's residence, which was a duplex, she proceeded

to the back of the duplex. As noted earlier, Martin testified that it was a common practice to place at least one officer at the back of a residence when attempting to contact a witness at his residence. Here, Martin went to the back of the duplex "in case anybody came running out the door." When Martin got to the back of the duplex, she proceeded toward the back entrance. The back entrance of the duplex consists of a small platform, a set of five steps leading from the ground up to a small platform with a door to the lower-level unit, and then a longer stairway attached to the left side of the platform leading to Milton's upper-level residential unit of the duplex. Pictures in the record indicate that a visitor could access the lower-level unit of the duplex through a door opening on to the platform, and the upper-level unit of the duplex by ascending the stairway attached to the left side of the platform.[5] Martin testified she began to ascend the set of five steps to the platform, and as she did so, she saw a shell casing on the stairway leading to Milton's upper-level unit. After seeing the shell casing on the stairway, Martin took a photograph of it. She then looked for more shell casings as she stood on the platform. While still standing on the platform, she then saw a second shell casing on the platform. Martin also photographed the second shell casing and then took possession of both shell casings.

Officer Martin's testimony at trial varied slightly from her pretrial testimony. At trial, Martin testified that she first saw the shell casing on the platform, and then she saw the other shell casing on the stairway leading to Milton's upper-level unit of the duplex. While we acknowledge this discrepancy in Martin's testimony as to which shell casing she saw first, we conclude that the order in which Martin saw the shell casings does not bear on our analysis of whether Martin found the shell casings on curtilage, and thus on whether the shell casings are admissible evidence. Regardless of which shell casing Martin saw first, the record indicates that she viewed both shell casings from the set of five steps on the stairway leading from the ground to the platform and from the platform itself. As noted above, the set of five steps and the platform provide access to both levels of the duplex. Thus, the set of five steps and the platform are shared by Milton and the lower-level tenant,[6] and by the numerous visitors attracted to the multifamily residence. *See Krech*, 403 N.W.2d at 637. Accordingly, under our case law and that of the Supreme Court, we conclude that the shared set of five steps and the platform at the duplex constitute a common area. *See Id.*

■ Having concluded that the set of five steps leading to the platform and the platform itself constitute a common area, we also conclude that the area is not curtilage. *See Id.* Additionally, the lower part of the stairway attached to the left side of the platform—which leads from the platform to Milton's upper-level residential unit of the duplex—is capable of being viewed from the shared platform. Thus, Milton's expectation of privacy in that part of the stairway was "diminished." *See Id.*

---

**5.** The back of the duplex has a second set of steps, leading only to the lower-level unit. Because there was no evidence that any casings were found on this separate set of steps, our discussion is limited to the steps and platform shared by both units in the duplex.

**6.** Even if the door that opens on to the platform does not lead to the lower level of the duplex, the door certainly does not lead to an area used only by Milton. Thus, the set of five stairs leading to the platform and the platform are shared by Milton, who must use them to reach the back door of his upper-level duplex, and by someone else.

Therefore, we also conclude that the lower part of that stairway is not part of the curtilage of Milton's residence. *See Sorenson,* 441 N.W.2d at 458.

■ Based on the foregoing, we conclude that Officer Martin was not intruding upon the curtilage of Milton's residence when she viewed either of the shell casings. *Zanter,* 535 N.W.2d at 631 (stating that the police must be "legitimately in the position from which they view the object"). Further, for the same reasons, we also conclude that Martin was not intruding upon curtilage when she seized the shell casings by taking them into her possession. *Id.* (stating that the police must "have a lawful right of access to the object"). Accordingly, unless the shell casings' "incriminating nature" was not "immediately apparent," their seizure by Martin satisfies the plain-view exception. *Id.*

■ As previously stated, "a police officer can seize an object in plain view without a warrant only if the object's incriminating [nature] is immediately apparent." *In re Welfare of G.M.,* 560 N.W.2d 687, 693 (Minn.1997). In other words, the police must have "probable cause to believe the item or object is contraband." *Id.* at 693 (citing *Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987)). We have said that "[p]robable cause exists where 'the facts available to the officer would warrant a [person] of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of crime.'" *State v. DeWald,* 463 N.W.2d 741, 747 (Minn.1990) (quoting *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)). But we have also said that the plain-view exception does not justify a warrantless seizure if the "police lack probable cause to believe that an object in plain view is contraband without conduct-

ing some further search of the object." *G.M.,* 560 N.W.2d at 693 (citations omitted) (internal quotation marks omitted).

Milton argues that Officer Martin lacked probable cause to believe the shell casings were contraband because there is no evidence that Martin knew what type of shell casings the police had found at the crime scene. Further, Milton argues that even if Martin did know the type of shell casings the police found at the crime scene, she could not have discerned the caliber of the shell casings found at the duplex without first conducting a further search of the shell casings found at the duplex. Thus, Milton argues that the incriminating nature of the shell casings found at the duplex could not have been immediately apparent to Martin.

Here, Officer Martin was a member of the VCA Team and had been asked by her fellow police officers, who were investigating a homicide involving a shooting, to contact Milton. Thus, she knew that there had been a shooting and that Milton had been identified as a potential witness to that shooting. As she stood lawfully at the back of the duplex where Milton lived, Martin noticed two shell casings sitting in the open. While Martin may not have discerned the caliber of the shell casings or even known the type of gun used in the shooting being investigated, she nevertheless had probable cause to believe that the shell casings "may be ... useful as evidence of crime." *DeWald,* 463 N.W.2d at 747 (citation omitted) (internal quotation marks omitted). Martin had been sent to Milton's home because the police believed Milton was a witness to a shooting homicide, which necessarily involved a gun and therefore most likely involved shell casings. Moreover, the shell casings themselves indicated that someone may have discharged a firearm in violation of a Minneapolis city ordinance. *See* Minneapolis,

Minn., Code of Ordinances § 393.150 (2012) ("No person shall fire off, discharge or explode any weapon or use any weapon against another. . . ."). Finally, it would not be unreasonable for Martin to have believed that the shell casings that she found discarded near a multifamily residence within city limits were by their very nature "incriminating." *Cf. Brooks*, 645 F.3d at 976 ("Hidden guns, even badly hidden guns, are by their nature incriminating." (citation omitted) (internal quotation marks omitted)). For the foregoing reasons, we conclude that Martin had probable cause to believe that the shell casings may have been useful as evidence of a crime and thus that the incriminating nature of the shell casings was immediately apparent. *See DeWald*, 463 N.W.2d at 747.

Having concluded that officer Martin was "legitimately in the position from which [she] viewed the [shell casings,]" and that the shell casings' "incriminating nature [was] immediately apparent," we also conclude that the seizure of the shell casings at Milton's residence satisfies the plain-view exception.[7] *Zanter*, 535 N.W.2d at 631. Therefore, we hold that the district court did not err when it denied Milton's motion to suppress those shell casings.[8]

## II.

 We now turn to Milton's second argument, his assertion that the State committed prosecutorial misconduct when it made references at trial to the shell casings found in Milton's truck. "We re-

view prosecutorial misconduct to determine whether the conduct, 'in light of the whole trial, impaired the defendant's right to a fair trial.'" *State v. Nissalke*, 801 N.W.2d 82, 103 (Minn.2011) (quoting *State v. Mayhorn*, 720 N.W.2d 776, 785 (Minn. 2006)). If defense counsel did not object to the alleged prosecutorial misconduct, we review the alleged misconduct under our "modified plain error test." *Id.* Under our modified plain error test, the defendant has the burden of proving that an error was made and that the error was plain. *Id.* If the defendant is able to satisfy this burden, "the burden shifts to the State to demonstrate that the error did not affect the defendant's substantial rights." *Id.* (citation omitted) (internal quotation marks omitted).

At a pretrial hearing, the State acknowledged that it would be unable to introduce into evidence the shell casings found in Milton's truck due to a potential Confrontation Clause problem because the police officer who found the shell casings would be unavailable to testify because he had died. Nevertheless, the State qualified its position by stating that "the defendant was confronted numerous times about the existence of these casings. . . . It is the State's intent to produce the evidence through [Milton's statements] or produce the statement." After noting the State's qualification, the district court turned to Milton's attorney and made the following statement: "[J]ust so that I am clear, you are objecting to the admissibility of the casings themselves but not objecting to introduction of the fact that the defendant was

---

7. As previously mentioned, the parties make no argument as to whether Martin had "a lawful right of access" to the shell casings, and so we do not consider that aspect of the plain-view exception. *Zanter*, 535 N.W.2d at 631.

8. We note that our conclusion in this case is driven by the fact that Milton resides in a multifamily residence. Additionally, we do not decide whether the upper part of the stairway leading from the platform to Milton's upper-level residential unit—on which no shell casing was found, and which may not be visible from the shared platform—is curtilage.

asked about those casings." Milton's attorney responded, "Correct, Your Honor." Milton's attorney went on to explain that he was concerned about the possibility that he might "open the door to allow the State to introduce" the casings through other witnesses if he "pursued ... the truth or untruth of the statement."

During the State's opening statement at Milton's trial, the State told the jury that the police officer who processed the search warrant on Milton's truck had since died so the jury would not "get to see what was found inside of it." But, the State said, "you will get to hear [Milton] confronted repeatedly with the fact that two discharged casings were found in the truck and you'll hear his continually changing, sometimes impossible explanation as to how those casings got to be in his truck." The State went on to say that "the officers had received the ballistics reports on all these discharged casings I've been talking about. All consistent with having been fired from the same weapon." Milton did not object to these statements at the time they were made to the jury.

Later in the trial, Milton made a motion requesting "the Court to order the State ... not to make any reference by way of testimony of any witness to the death of [the police officer] and the product of his search." The district court granted Milton's motion. The court stated: "I want any statements referencing shell casings found in the defendant's vehicle redacted from any statement introduced by the State." The court also prepared a curative instruction for the jury. The court later denied a motion by Milton for a mistrial based on the State's opening statement.

The State subsequently moved to play for the jury a redacted recorded statement Milton made to the police during his third interview. Before the State played the recorded statement, the district court told

the jury, "You're also instructed that the audio recording has been redacted by the Court." The court then asked if Milton's attorney had any objection. Milton's attorney responded that he did not have any objection, "[s]ubject to our understanding." The State then played the recorded statement and provided the jury with a printed transcript of the statement. Both the recorded statement and the printed transcript of the statement included the following reference to the shell casings found in Milton's truck:

> [Tre–Deuce] shot that motherfucker out of my [truck] windows like four times, you know what I'm saying—boom-boom-boom-boom-boom—*and the shells flipped back in....* I'm thinking Tre–Deuce is right behind me shooting out the back, out the uh, roof; now unless he spilled out of the truck and got him and shot him, and got back in; I'm not sure. But either way it go, he was in the back, *and that's how them shells had to get in the back.*

(Emphasis added.) At the close of trial, the court reviewed its proposed curative instruction with counsel. Milton's attorney declined having the court's proposed curative instruction given to the jury, thinking "it was wiser" to have the court "amend the general instruction." As previously noted, after the jury's deliberations had begun, the court replayed the redacted statement following the jury's request that the court do so.

Milton argues that the State committed prosecutorial misconduct in its opening statement when it referenced the shell casings found in his truck. The basis for Milton's argument is that the State had earlier conceded that it could not introduce those shell casings into evidence. Milton also argues that the State committed prosecutorial misconduct when it played the redacted recording of Milton's statement

referencing the shell casings found in his truck. The basis for this argument is that the reference in the recorded statement violated the district court's order to redact such references from all evidence. We will first consider whether the State committed prosecutorial misconduct in its opening statement, and then consider the recorded statement.

### A.

 Because Milton did not object to the State's opening statement, we review the alleged misconduct under our modified plain error test. *Nissalke*, 801 N.W.2d at 103. As noted earlier, under our modified plain error test, the defendant must prove that an error was made and that the error was plain. *Id.* If the defendant does not prove that the State made a plain error, our analysis ends. If the defendant proves that a plain error occurred, the State must then prove that the error did not affect the defendant's substantial rights. *Id.* We have said that "[i]n general it is misconduct for a prosecutor to knowingly offer inadmissible evidence for the purpose of bringing it to the jury's attention." *State v. Smallwood*, 594 N.W.2d 144, 150 (Minn.1999). Additionally, it is "improper for a prosecutor to refer to evidence in an opening statement without a good-faith basis for believing the evidence is admissible." *Id.*

Here, we conclude that the State made no error in its opening statement when it referred to the fact that Milton was asked about the shell casings found in his truck. As mentioned above, the parties and the district court agreed at a pretrial hearing that while the actual shell casings found in Milton's truck were inadmissible, the State could introduce the fact that Milton was *asked* about the shell casings during an interview. Thus, the State's opening statement complied with the agreement

between the parties and the court. At the very least, because the State complied with the agreement, if any error occurred, it certainly was not plain. For the foregoing reasons, we hold that the State did not plainly err when making its opening statement and thus did not commit prosecutorial misconduct.

### B.

 We next consider whether the State committed prosecutorial misconduct when it played for the jury the recorded statement Milton made to the police. Milton did not object to the State's playing, or the district court's replaying, of his recorded statement. Because Milton did not object, we also review this alleged prosecutorial misconduct under our modified plain error test. *Nissalke*, 801 N.W.2d at 103. Thus, we consider first whether Milton has proved that the State made an error. *Id.*

Here, the State made no error when it played Milton's redacted recorded statement before the jury. First, the record indicates that both the district court and Milton specifically agreed to the redactions. Second, the record also indicates that it was the court, and not the State, that undertook the act of redacting the recorded statement. The court told the jury, "You're also instructed that the audio recording has been redacted *by the Court.*" (Emphasis added.) Because there is no evidence in the record that the State was responsible for the redactions, we conclude that the State made no error when playing the recorded statement. Accordingly, we hold that the State did not commit prosecutorial misconduct.

### III.

The last issue for our consideration is whether the district court erred by failing to give the jury a proper accomplice liability instruction. Milton argues that the

court's failure to give a proper accomplice liability instruction constitutes a plain error affecting his substantial rights and warrants the grant of a new trial. Specifically, Milton argues that the jury instructions as given by the court relieved the State of its burden of proving beyond a reasonable doubt that Milton knew his alleged accomplices planned to commit an aggravated robbery and that he intended his presence at the crime scene to further the commission of that crime. Milton also argues that the fact that the jury requested a "legal definition of aid and aided" and "clarification on intent" indicates a strong possibility that the jury found Milton guilty as an accomplice rather than as a principal perpetrator. Based on these arguments, Milton claims that the jury may have found him guilty as an accomplice on an erroneous understanding of accomplice liability. In essence, Milton argues that the court did not require the jury to find that he "knowingly and intentionally aid[ed] another to commit [the] aggravated robbery," as required under our case law.

 Milton did not object to the jury instructions at the time of trial; therefore, we review the unobjected-to jury instructions for plain error. *State v. Vance,* 734 N.W.2d 650, 654–55 (Minn. 2007), *overruled on other grounds by State v. Fleck,* 810 N.W.2d 303 (Minn.2012). Under our plain-error test, we consider whether the jury instructions contained an (1) error (2) that was plain and (3) that affected the defendant's substantial rights. *Id.* at 655–56. If these three prongs of our plain-error test are met, we then decide whether we must "address the error to ensure fairness and the integrity of the judicial proceedings." *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). In the course of this analysis, we review the jury instructions in their entirety to determine whether the instructions "fairly and adequately explain the law" of the case. *Vance,* 734 N.W.2d at 656. Additionally, while it is "well settled that jury instructions must define the crime charged and explain the elements" of that crime to the jury, *id.,* we nevertheless give district courts "broad discretion and considerable latitude in choosing the language of jury instructions," *State v. Smith,* 674 N.W.2d 398, 400 (Minn.2004). Absent an abuse of that discretion, we will not reverse a district court's decision on jury instructions. *State v. Mahkuk,* 736 N.W.2d 675, 682 (Minn.2007).

 A defendant is guilty of aiding and abetting if the defendant "intentionally aids, advises, hires, counsels, or conspires with or otherwise procures [another] to commit" a crime. Minn.Stat. § 609.05, subd. 1. In *State v. Mahkuk,* we explained that the element of "intentionally aiding" embodies two important and necessary principles: (1) that the defendant "knew that his alleged accomplices were going to commit a crime," and (2) that the defendant "intended his presence or actions to further the commission of that crime." 736 N.W.2d at 682. Thus, in order to prove that Milton was guilty of aiding and abetting in this case, the State had to prove beyond a reasonable doubt that (1) Milton knew his alleged accomplices were going to commit a crime, and that (2) he intended his presence and actions to further the commission of that crime.[9] Accordingly, if the district court's instructions allowed the jury to find Milton guilty as an accomplice without first finding that Milton knowingly and intentionally assisted in the commission of a crime, the court

---

**9.** We note that the relevant CRIMJIG does not explain these requirements. 10 Minn. Dist. Judges Ass'n, *Minnesota Practice–Jury* *Instruction Guides, Criminal,* CRIMJIG 4.01 (5th ed.2006).

erred. *See Vance*, 734 N.W.2d at 656 (stating that jury instructions must explain the elements of the charged crime).

The State charged Milton as an accomplice to both first-degree felony murder and attempted first-degree felony murder.[10] Both offenses require the State to prove that Milton "intentionally aid[ed]" his accomplices. Minn.Stat. §§ 609.05, subd. 1, 609.17, 609.185(a)(3); *see also Mahkuk*, 736 N.W.2d at 682. We consider each offense in turn when considering whether the court erred in its instructions to the jury.

## A.

We consider first whether the district court erred in its instructions to the jury on first-degree felony murder. The court gave the jury the following instructions on first-degree felony murder [11]:

The elements of murder in the first degree are as follows: First, the death of Dontae Johnson must be proven.

Second, the defendant or a person whom the defendant intentionally aided caused the death of Dontae Johnson.

Third, the defendant, or a person whom the defendant aided, acted with the intent to kill Dontae Johnson. To find the defendant had an intent to kill, you must find that the defendant acted with the purpose of causing death or believed that the act would have that result. Intent, being a process of the mind, is not always susceptible to proof by direct evidence. It may be inferred from the all the circumstances surrounding the event. It is not necessary that the defendant—that the defendant's act be premeditated.

Fourth, at the time of the act causing the death of Dontae Johnson, the defendant, or a person whom the defendant aided, was engaged in the act of committing or attempting to commit the crime of aggravated robbery. . . .

We must determine whether these instructions "define the crime charged and explain the elements" of the crime. *Vance*, 734 N.W.2d at 656.

After reviewing the jury instructions as a whole, we conclude that the instructions fail to properly explain the element of "intentionally aiding" to the jury. Specifically, we conclude that under the instructions given, a reasonable jury would not necessarily understand that before it could find Milton guilty of first-degree felony murder, it first had to find that Milton knew his alleged accomplices were going to commit a crime and that Milton intentionally assisted in that crime. This potential lack of understanding is due to the district court's failure to explain the "intentionally aiding" element to the jury. If the court had explained this element properly, the jury would have been instructed that under Minnesota law, the State had to prove beyond a reasonable doubt that Milton (1) knew his alleged accomplices were going to commit a crime, and (2) intended his presence to further the commission of that crime. *E.g.*, *Mahkuk*, 736 N.W.2d at 682. Because the court failed to explain a required element of the charged offense, we conclude that the court erred when it instructed the jury on first-degree felony murder. *See Vance*, 734 N.W.2d at 657.

Our conclusion that the district court erred does not end our analysis; rather, the conclusion takes us to the next step of our plain-error test. Under our

---

**10.** As noted earlier, the State also charged Milton as a principal for both offenses.

**11.** It appears from the record that the jury was not provided with written jury instructions, and received only oral instructions.

plain-error test, after concluding that the court erred, we must next consider whether that error was plain. *Griller*, 583 N.W.2d at 740. An error is plain if it is "clear" or "obvious." *Vance*, 734 N.W.2d at 658 (citation omitted) (internal quotation marks omitted). Only if we conclude that the court committed a plain error do we consider whether that error affected the defendant's substantial rights and whether we must "address the error to ensure fairness and the integrity of the judicial proceedings." *Griller*, 583 N.W.2d at 740.

We acknowledge that we have never before specifically required district courts to explain to juries that a defendant intentionally aids another person if the defendant knowingly and intentionally assists in the commission of the underlying crime. Nevertheless, our reasoning in *Mahkuk* leads us to conclude that such an instruction is required. In *Mahkuk*, we concluded that the district court erred in its accomplice liability jury instructions. 736 N.W.2d at 682–83. In that case, the court had properly instructed the jury that, to be criminally liable as an accomplice the State had to prove beyond a reasonable doubt that Mahkuk must have intentionally aided another person in the commission of the underlying crime. *See Id.* at 682. But the court went on to instruct the jury that it could choose to "consider" Mahkuk's knowledge and intent with respect to that crime. *Id.* By instructing the jury that it could merely "consider" Mahkuk's knowledge and intent, we held that the court's instruction relieved the State of its burden of proving Mahkuk's knowledge and intent beyond a reasonable doubt. *Id.* at 683. Because the State no longer had to prove Mahkuk's knowledge and intent, the court's instructions effectively eliminated the "intentionally aiding" element. *Id.*

In *Mahkuk*, we held that the effective elimination of the "intentionally aiding" element constituted reversible error. *Id.* In reaching this holding, we made clear that a district court's accomplice liability jury instructions may not relieve the State of its burden of proving the "intentionally aiding" element beyond a reasonable doubt. *Id.* But, we did not make clear that jury instructions must explain that the "intentionally aiding" element requires knowing and intentional assistance in the underlying crime. Moreover, in the cases in which we cited *Mahkuk* for its explanation of "intentionally aiding," we were considering sufficiency-of-the-evidence issues, not the adequacy of jury instructions. *See, e.g., State v. Pendleton*, 759 N.W.2d 900, 909–11 (Minn.2009); *State v. Clark*, 755 N.W.2d 241, 256–58 (Minn.2008).

 Here, we conclude that by instructing the jury that it must find that Milton "intentionally aided" his alleged accomplices, the district court presented the "intentionally aiding" element to the jury. But, the issue here is not whether the court presented the "intentionally aiding" element of accomplice liability. Rather, the issue is whether the court committed a "clear" or "obvious" error when it failed to provide the jury with a further explanation of that element. *Vance*, 734 N.W.2d at 658 (citation omitted) (internal quotation marks omitted). It is particularly troubling that the "intentionally aiding" language was not included in the court's instruction on the fourth element, an instruction that specifically addressed the underlying crime of aggravated robbery. Nevertheless, because we have not yet clearly required district courts to include a specific explanation of the "intentionally aiding" element until today, we conclude that the court's instructions did not constitute "clear" or "obvious" error, and thus the court's error is not plain. *Id.* But, we

take this opportunity to emphasize that an accomplice liability jury instruction must explain to the jury that in order to find a defendant guilty as an accomplice, the jury must find beyond a reasonable doubt that the defendant knew his alleged accomplice was going to commit a crime and the defendant intended his presence or actions to further the commission of that crime.[12] *Mahkuk*, 736 N.W.2d at 682.

## B.

■ We now consider whether the district court erred in its instructions to the jury on attempted first-degree felony murder. The court gave the jury the following instructions on attempted first-degree felony murder:

> The elements of attempted murder in the first degree are, first, the defendant or another person with the defendant— whom the defendant aided attempted to cause the death of [C.W.].
>
> Second, the defendant acted with intent to kill [C.W.]. To find the defendant had an intent to kill, you must find that the defendant or a person whom the defendant aided acted with the purpose of causing death, or believed that the act would have that result.
>
> Intent, being a process of the mind, is not always susceptible to proof beyond— to proof by direct evidence but may be inferred from all circumstances sur-

rounding the event. It is not necessary that the act of the defendants or the act of the person whom he aided be premeditated.

> Third, at the time of the attempt to cause the death [of] [C.W.], the defendant or a person whom he aided was engaged in the act of committing or attempting to commit the crime of aggravated robbery.

Unlike its jury instructions on first-degree felony murder, the district court's instructions on attempted first-degree felony murder do not include the "intentionally aiding" element of accomplice liability.[13] In other words, the court's instructions on first-degree felony murder included the "intentionally aided" element but failed to give a thorough explanation of that element. Here, the court not only failed to explain the element, it failed to present the jury with that element altogether. We have said that a failure to instruct the jury on an element of a crime charged constitutes plain error. *Vance*, 734 N.W.2d at 658–59. Accordingly, we conclude that the court plainly erred when it failed to instruct the jury that, in order to find Milton guilty of attempted first-degree felony murder, the jury had to find that Milton intentionally aided his alleged accomplices in the commission of a crime.

■ Under our plain-error test, after we conclude that the district court has

---

**12.** While we require accomplice liability jury instructions to explain what the "intentionally aiding" element means, we afford the district courts "considerable latitude" in choosing the language explaining that element. *State v. Ihle*, 640 N.W.2d 910, 916 (Minn.2002).

**13.** Before instructing the jury on attempted first-degree felony murder, the district court read the indictment against Milton to the jury. In reading the indictment, the court stated:

> Count 2, attempted murder in the first degree. That on or about January 2, 2010, in Hennepin County, Minnesota, Javaris

> Eugene Milton, acting alone or intentionally aiding, advising, hiring, counseling, or conspiring with others, attempted to cause the death of [C.W.], a human being, with the intent to effect the death of [C.W.] or another while committing or attempting to commit the crime of aggravated robbery.

While we acknowledge that the court used the "intentionally aiding" language when reading the indictment, this reference to the indictment is insufficient to conclude that the jury was instructed on the "intentionally aiding" element of accomplice liability.

committed a plain error, we then consider whether that error affected the defendant's substantial rights. *State v. Reed,* 737 N.W.2d 572, 583 (Minn.2007). An error affects a defendant's substantial rights if there is a " 'reasonable likelihood' " that the error had a " 'significant effect' " on the jury's verdict. *Id.* (quoting *State v. MacLennan,* 702 N.W.2d 219, 236 (Minn. 2005)). In other words, we consider "whether the error was prejudicial and affected the outcome of the case." [14] *State v. Carridine,* 812 N.W.2d 130, 142 (Minn. 2012) (citing *Griller,* 583 N.W.2d at 741). The defendant bears the " 'heavy burden' " of proving that the error was prejudicial. *Id.* at 143 (quoting *State v. Burg,* 648 N.W.2d 673, 677 (Minn.2002)). Accordingly, Milton bears the heavy burden of proving that there is a reasonable likelihood the jury's verdict would have been different had the jurors been specifically instructed that they could not find Milton guilty unless they found that Milton knowingly and intentionally assisted another to commit a crime.

We conclude that there is no reasonable likelihood that the district court's incomplete jury instructions had a significant effect on the guilty verdict against Milton for attempted first-degree felony murder. We reach this conclusion because even if the jury had been properly instructed, we conclude the jury would have found that Milton intentionally aided his alleged accomplices based on the evidence presented at trial. There was ample evidence presented at trial to support a finding by the jury that Milton knew his alleged accomplices were going to commit a crime and that Milton intended his presence at the crime scene to further the commission of that crime. The jury heard evidence that Milton and his alleged accomplices planned to rob Johnson and had made "fake money" in preparation for doing so. The jury also heard evidence that Milton used his truck to drive his alleged accomplices to meet Johnson. Finally, the jury heard evidence indicating that Milton brought his gun to this meeting with Johnson.

From these facts—that Milton knew his alleged accomplices planned to rob Johnson, drove the accomplices to meet Johnson so that they could rob Johnson, and brought his gun to the planned robbery— the jury would have concluded that Milton knowingly and intentionally assisted in the commission of a crime. Thus, the jury would have found Milton guilty even if the district court had instructed the jury on the requisite "intentionally aiding" element and properly explained that element to the jury.[15] Accordingly, we conclude that there is no reasonable likelihood that the incomplete instructions on attempted first-degree felony murder had a significant

---

**14.** While some of our case law indicates that a district court's failure to instruct a jury on an element of an offense is always prejudicial, *State v. Moore,* 699 N.W.2d 733, 737–38 (Minn.2005), other case law from our court indicates that failure to instruct on an element may be harmless under certain circumstances, *State v. Spencer,* 298 Minn. 456, 463–64, 216 N.W.2d 131, 136 (1974). In this case, we deem it appropriate to consider whether the court's failure to instruct the jury on the "intentionally aiding" element of accomplice liability affected Milton's substantial rights. *See Vance,* 734 N.W.2d at 659–61 (discussing the inconsistency in the case law).

**15.** We also note that there was evidence presented at trial that Milton was guilty as a *principal* perpetrator of the attempted first-degree felony murder of C.W.—the jury heard Milton's brother testify that he saw Milton shoot at C.W. If the jury found Milton guilty of attempted first-degree felony murder as a principal perpetrator, and not as an accomplice, it follows that the court's instructions on accomplice liability as to that offense would have had no effect on the jury's verdict.

effect on the jury's verdict. *See Reed,* 737 N.W.2d at 583.

For the foregoing reasons, we conclude that Milton has failed to meet his " 'heavy burden' " of proving that the district court's plain error affected his substantial rights. *Carridine,* 812 N.W.2d at 143 (quoting *Burg,* 648 N.W.2d at 677). Therefore, even though we conclude that the court erred when it failed to instruct the jury on the "intentionally aiding" element of accomplice liability, we hold that this error does not warrant the grant of a new trial.

Affirmed.