*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1371**

State of Minnesota,
Respondent,

vs.

Tammy Jo Schoenrock,
Appellant.

**Filed June 13, 2016
Affirmed
Reilly, Judge**

Hennepin County District Court
File No. 27-CR-14-23742

Lori Swanson, Attorney General, Scott E. Haldeman, Assistant Attorney General, St. Paul, Minnesota (for respondent)

Paul Engh, Minneapolis, Minnesota (for appellant)

Considered and decided by Worke, Presiding Judge; Reilly, Judge; and Smith, Tracy, Judge.

## UNPUBLISHED OPINION

**REILLY**, Judge

Appellant challenges her two convictions of theft by false representation (over $5,000), arguing that the jury instructions failed to accurately explain the elements of the crime. Because the district court did not abuse its discretion in instructing the jury about the charged crime, we affirm.

**FACTS**

A personal care assistant (PCA) is an individual who is employed by an agency to provide various services that allow the recipient of those services to continue to live at home rather than move to a care facility. To be paid by the agency, the PCA is required to fill out timesheets recording the hours that have been worked. The agency is reimbursed by the State of Minnesota or the recipient's health plan. The PCA's timesheets must be accurate and are relied upon for the proper disbursement of those funds. A responsible party is an individual who acts on behalf of a recipient of PCA services who is unable to make decisions in her own best interests. A recipient's PCA and responsible party cannot be the same person, and both the PCA and the responsible party must sign the PCA's timesheets.

An individual must complete training and pass a competency test and a background check to become a PCA. *See* Minn. Stat. § 256B.0659, subds. 11(a)(3), (8) (2014) (requiring PCA applicant to pass background study, complete standardized training, and demonstrate competency to provide PCA services); Minn. R. 9505.0335, subp. 3 (2015) (providing PCA training requirements). As part of the training, PCA applicants are told that a "time card is your official statement that you have actually worked these hours"; "[y]ou are breaking the law if you claim even one hour of PCA services on your time card that you did not provide"; "[t]o avoid fraudulent behavior, only document hours of work . . . [w]hen you are present in your role as a PCA" and "engage[d] in PCA work activity"; and "[d]o not . . . [a]ccept money when you have not done the work" or "[f]ill out a time card for days you do not provide any PCA services." PCA applicants are also told during

2

training, "you must be careful only to bill for hours you actually worked and complete the time card and signatures after the hours have been worked. You are making a promise that you have actually worked these hours."

Appellant Tammy Jo Schoenrock's elderly mother, M.S., was diagnosed with Alzheimer's disease. M.S.'s health plan, Medica, authorized M.S. to receive PCA services. Schoenrock completed training, passed a competency test and a background check, and was hired by Accra Care, an agency, to serve as M.S.'s PCA. J.M., Schoenrock's close friend, was selected to serve as M.S.'s responsible party.

In April 2010, Schoenrock signed documents acknowledging her understanding that "[f]raud" is "an intentional act of deception, misrepresentation or concealment in order to gain something of value"; examples of fraud include "billing for services that were never rendered" and "deliberately misrepresenting services, resulting in unnecessary cost to the Medicare program, improper payments to providers or overpayments"; and "[i]t is a crime to provide false information for Medical Assistance payment." Schoenrock further acknowledged her understanding that "[t]he PCA . . . can only be paid for work done when the PCA is physically present and providing medically necessary care for the Consumer" and "cannot submit a timesheet for hours not worked."

Schoenrock began to serve as M.S.'s PCA during the spring of 2010. M.S. lived with Schoenrock in Eden Prairie until M.S. became unable to navigate the stairs in Schoenrock's home. In May 2011, M.S. moved in with L.S., M.S.'s daughter and Schoenrock's sister, who lived in a single-level home in Fergus Falls. Schoenrock informed Accra Care and Medica that she would continue to reside in Eden Prairie, that

3

she would continue to provide care for M.S. in Fergus Falls, and that she would be "making the trip back and forth." Employees of Accra Care and Medica believed that M.S.'s move to Fergus Falls was temporary and that Schoenrock "was considering having renovations made to her house." After M.S. moved, Schoenrock initially visited L.S.'s home every Friday and occasionally spent the night and left on Saturday morning, but these visits progressively declined in frequency. L.S. instead provided care for M.S., and eventually other women were employed to provide additional care because, according to L.S., "[M.S.]'s care[] became too much for one person."

Between May 2011 and April 2012, Schoenrock and J.M. signed and submitted timesheets reporting that Schoenrock provided M.S. 63 hours of PCA services per week. Schoenrock claimed to have provided PCA services even at times when she was working at another job and during an approximately two-week period in March 2012 when she was in Florida. Each timesheet noted that a signature verified that the hours recorded were "true and accurate" and that "[e]mployees are only paid for time they are physically present and working with the consumer." L.S. testified that Schoenrock never provided M.S. 63 hours of PCA services per week while M.S. lived with L.S. Schoenrock was paid by Accra Care for the hours reported on her timesheets. Schoenrock gave L.S. between $400 and $500 per week for L.S.'s care of M.S., and L.S. believed that this money came from M.S.'s social security payments.

During the spring of 2012, employees of Accra Care and Medica discovered that M.S.'s move to Fergus Falls was permanent and began an investigation. Schoenrock was subsequently charged with two counts of theft by false representation (over $5,000), in

4

violation of Minn. Stat. § 609.52, subd. 2(3)(iii) (2010). During the jury trial, Schoenrock testified that, when she was submitting timesheets and being paid by Accra Care while L.S. was caring for M.S., she "had no idea" "that was wrong or somehow illegal," did not "believe that [she was] providing false information," and "[n]ever" had an "intent to steal any money from Accra Care." Schoenrock explained: "I figured my sister was an extension of me and I didn't really see how it mattered since I had been filling [the timesheets] out." She further testified that "since my sister and I were working together, I thought it was fine because I was giving her the money," and "I viewed [L.S.] and myself as one unit, two daughters taking care of my mother, and [L.S.] and I shared the responsibilities and we shared the income." Schoenrock acknowledged that "by filling out a time card for Accra Care, [it] was [her] intent to get paid by that time card." She testified that she received approximately $3,000 per month from Accra Care while M.S. lived with L.S. and that she paid L.S. approximately $1,800 per month.

During trial, Schoenrock requested that the jury instructions list intent to defraud as one of the elements of the charged crime. The district court denied this request. The court determined that the element of intent to defraud was adequately explained in the jury instruction guides for the crime of theft by false representation and provided the jury with instructions consistent with the jury instruction guides. The jury was instructed:

> The statutes of Minnesota provide that whoever obtains for herself the possession, custody, or title to [the] property of another person by intentionally deceiving the other with a false representation that is known to her to be false and is made with intent to defraud and does defraud the person to whom it is made, is guilty of a crime.

5

The elements of theft by false representation are: One, the defendant obtained possession of monetary funds. Two, the monetary funds were the property of . . . Accra Care. Three, the defendant intentionally made the representation to Accra Care in order to obtain the monetary funds. This means the defendant made the representation for the purpose of obtaining the monetary funds.

Four[], the defendant knew or believed the representation was false. Fi[ve], the defendant intended Accra Care to believe . . . the representations were true. Six[], Accra Care believed the representations were true and, in reliance on those representations, gave the defendant possession of the monetary funds. Seven, the defendant's acts took place on or about May 2nd, 2011 through October 26th, 2011 in Hennepin County [for count one and] . . . on or about November 2nd, 2011 through April 2nd, 2012 in Hennepin County [for count two].

The jury was also asked to determine for each count whether Schoenrock obtained more than $5,000. The jury found Schoenrock guilty of two counts of theft by false representation (over $5,000), and this appeal follows.

## D E C I S I O N

A "[d]enial of a requested jury instruction is reviewed for abuse of discretion." *State v. Wenthe*, 865 N.W.2d 293, 302 (Minn. 2015), *cert. denied*, 136 S. Ct. 595 (2015). "While district courts have broad discretion to formulate appropriate jury instructions, a district court abuses its discretion if the jury instructions confuse, mislead, or materially misstate the law." *State v. Taylor*, 869 N.W.2d 1, 14-15 (Minn. 2015) (quotation omitted). "Whether a district court's jury instructions correctly state the law presents a question of statutory interpretation, which [appellate courts] review de novo." *State v. Davis*, 864 N.W.2d 171, 178 (Minn. 2015). Jury instructions are reviewed "in their entirety to

6

determine whether the instructions fairly and adequately explain the law of the case" and "define the crime charged and explain the elements of that crime to the jury." *State v. Milton*, 821 N.W.2d 789, 805 (Minn. 2012) (quotations omitted). "[A] court need not give a requested instruction if the substance of the instruction is already contained in the existing jury instructions." *State v. Yang*, 774 N.W.2d 539, 559 (Minn. 2009).

A person commits theft by "obtain[ing] for the actor or another the possession, custody, or title to property of . . . a third person by intentionally deceiving the third person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made." Minn. Stat. § 609.52, subd. 2(3) (2010). "'False representation' includes . . . the preparation or filing of a claim for reimbursement . . . for medical care provided to a recipient of medical assistance under chapter 256B, which intentionally and falsely states the costs of or actual services provided by a vendor of medical care . . . ." *Id.*, subd. 2(3) (iii); *see also* Minn. Stat. §§ 256B.01-.84 (2010 & Supp. 2011) (providing laws governing medical assistance for needy persons).

Schoenrock argues that the district court violated the doctrine of in pari materia and the rule of lenity when the court declined to list intent to defraud as one of the elements of the crime in the jury instructions. In pari materia is a canon of statutory interpretation that "allows two statutes with common purposes and subject matter to be construed together to determine the meaning of ambiguous statutory language." *State v. Nelson*, 842 N.W.2d 433, 441-42 (Minn. 2014) (quotations omitted). The rule of lenity requires that a statutory ambiguity be resolved in favor of a criminal defendant "when a grievous ambiguity or uncertainty in the statute remains after [the court] ha[s] considered other canons of statutory

7

construction." *Id.* at 443-44 (quotation omitted). The language of section 609.52, subdivision 2(3), explicitly provides that proof of the crime of theft by false representation requires proof that the representation was made with intent to defraud. *See* Minn. Stat. § 609.52, subd. 2(3) (stating that theft is committed by obtaining property of "a third person by intentionally deceiving the third person with a false representation which is known to be false, *made with intent to defraud*, and which does defraud the person to whom it is made" (emphasis added)). Schoenrock has not identified a statutory ambiguity, and therefore application of the doctrine of in pari materia or the rule of lenity is inapposite. *See State v. Grigsby*, 818 N.W.2d 511, 517 (Minn. 2012) (stating that rule of lenity does not apply if challenged statute is unambiguous); *State v. Lucas*, 589 N.W.2d 91, 94 (Minn. 1999) (stating that doctrine of in pari materia is not used absent statutory ambiguity).

Schoenrock maintains that the jury instructions failed to accurately explain the elements of the crime of theft by false representation. She cites *State v. Williams*, 324 N.W.2d 154 (Minn. 1982), to support her argument that the district court's failure to list intent to defraud as an element is reversible error. The codefendants in *Williams* owned a business that sold "precut log home packages" and issued checks for payment to companies that supplied and delivered logs. *Id.* at 155-56. The defendants' business had accounts receivable but, due to some defective logs, the business's checking account had insufficient funds to cover the checks to the supplier and deliverer, the checks were dishonored, and the business was eventually forced into bankruptcy. *Id.* at 156. The defendants were charged with theft by false representation for issuing checks from an account with insufficient funds to cover the checks. *Id.* at 156-57. The jury returned guilty verdicts after

8

being instructed that the elements of the crime were that the defendants "obtained for themselves or their company the possession, custody, or title of the logs"; "intentionally issued a check to obtain the logs"; "kn[ew] or believed that [they were] not entitled to issue the check or checks"; "intended that [a victim] believe[] that defendant[s were] entitled to issue the check or checks"; the victim "believed that defendant[s were] entitled to issue the check or checks and . . . in reliance on that belief, he must have given defendants or another possession, custody, or title to the logs"; and "the defendants' actions [took] place in Aitkin County." *Id.* at 156, 158. The supreme court determined that the instruction was inadequate because it permitted the jury to find the defendants guilty of theft by false representation "despite the fact that the[y may have] intended to cover the check (for instance, with accounts receivable or receipts from the sale of goods obtained by issuing the check)." *Id.* at 159. The supreme court stated that, under the instruction given,

> a defendant can be found criminally liable without the jury having found the statutorily required element of specific intent to defraud, i.e., that the defendant, at the moment he issued the check, had the intention to defraud the other party by permanently depriving him of his property by never covering the check.

*Id.* The supreme court concluded that the instruction was reversible error and remanded for a new trial. *Id.* at 159-60.

While Schoenrock and the *Williams* defendants were similarly charged with theft by false representation, *Williams* is factually distinguishable from this case. The supreme court in *Williams* focused on the fact that a check initially written from an account with insufficient funds can later be covered by depositing funds into the account, and that intent

9

to defraud may be lacking in such a situation. *See id.* at 159. There is no evidence in this case of a similar way to cover or cure a PCA timesheet that is submitted to an agency and inaccurately reports hours that supposedly were already worked.

The criminal statutes do not define fraud, defraud, or intent to defraud. *Black's Law Dictionary* defines "defraud" as "[t]o cause injury or loss to (a person) by deceit" and "fraud" as "[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment." *Black's Law Dictionary* 488, 731 (9th ed. 2009). In this case, the jury was instructed that Schoenrock was guilty of theft by false representation if she intentionally made a representation to Accra Care for the purpose of obtaining Accra Care's monetary funds, knowing or believing the representation was false and intending Accra Care to believe the representation was true; Accra Care believed the representation was true and relied on the representation to give Schoenrock possession of monetary funds; and Schoenrock's acts took place in Hennepin County between certain dates. The jury instructions did not separately list intent to defraud as one of the elements of the crime. But we conclude that the elements as explained to the jury encompassed the element of intent to defraud and that the jury instructions when viewed in their entirety fairly and adequately explained the law applicable in this case. *See Milton*, 821 N.W.2d at 805 (stating that jury instructions viewed in their entirety must "fairly and adequately explain the law of the case," "define the crime charged[,] and explain the elements of that crime to the jury" (quotations omitted)); *Yang*, 774 N.W.2d at 559 (stating that "a court need not give a requested instruction if the substance of the instruction is already contained in the existing jury instructions").

Schoenrock contends that the jury instructions as given negated her defense that she thought submitting the timesheets was "fine," was not "wrong or somehow illegal," and "didn't really . . . matter[]." At oral argument, Schoenrock argued that proof of her guilt required proof that she knew she had done something "criminally wrong." We note that knowledge that one's actions constitute a crime is not a recognized element of the crime of theft by false representation. Here, the jury was instructed to determine whether Schoenrock knew or believed her timesheets were false, intended Accra Care to believe the timesheets were true, and intentionally submitted the timesheets to Accra Care for the purpose of obtaining Accra Care's monetary funds. Because the substance of the element of intent to defraud was contained in the jury instructions and the instructions did not misstate the law, the district court's denial of Schoenrock's requested instruction was not an abuse of discretion. We therefore need not address the parties' arguments regarding whether any error in the instructions may have been harmless.

**Affirmed.**