# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A15-2053

State of Minnesota,
Respondent,

vs.

Quentin Todd Chute,
Appellant.

**Filed November 21, 2016**
**Affirmed in part, reversed in part, and remanded**
**Cleary, Chief Judge**

Ramsey County District Court
File No. 62-CR-11-9695

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John Choi, Ramsey County Attorney, Adam E. Petras, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Steven P. Russett, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Cleary, Chief Judge; Worke, Judge; and Ross, Judge.

## S Y L L A B U S

When a police officer enters the curtilage of a home for the purpose of conducting a warrantless search, the officer's position within the curtilage is not lawful and the warrantless search violates the Fourth Amendment.

## O P I N I O N

**CLEARY**, Chief Judge

Appellant Quentin Todd Chute challenges his conviction for receiving stolen property. Appellant argues that the district court erred by denying his motion to suppress the evidence obtained from the warrantless search of his property, by denying his motion to dismiss for violation of his speedy-trial right, and by holding that the evidence was sufficient to support his conviction. We affirm in part, reverse in part, and remand.

### FACTS

On October 22, 2011, B.W.F. called the police to report that he located the camper that he had reported stolen in July 2011. An officer met B.W.F. near a residential property on County Road D in Maplewood. The property had two driveways. The first was at least partially asphalt and led to a garage, and the second was dirt and appeared to be used by cars carrying persons seeking a backdoor entrance to the house and garage. B.W.F. pointed out his camper to the officer from a location on County Road D at the end of the dirt driveway. The officer confirmed that the make and model of the camper matched those of the camper that B.W.F. had reported stolen.

The officer parked his squad in the dirt driveway and walked with B.W.F. down the driveway toward the camper. Before arriving at the camper, B.W.F. told the officer that he had repaired the front of the camper, leaving a unique set of bolts. These bolts were visible from the dirt driveway. At a spot on the driveway next to the camper, the officer could determine that its license plate was removed. The camper's vehicle identification

2

number (VIN) was also removed. The officer called the camper's manufacturer to determine if the VIN was stamped in another location, learned that a partial VIN was stamped on the metal frame, and located the partial VIN, which matched the VIN of the camper stolen from B.W.F. The officer went into the camper and located an item of personal property belonging to B.W.F.

The officer heard a noise coming from the garage, walked to the garage door, and knocked. Appellant answered and identified himself as the property owner. When the officer asked appellant if he owned the camper, appellant said he was storing it for a friend. Appellant consented to the officer's request to search the garage. After finding personal property from the camper in the garage, the officer asked appellant for permission to search the basement and house. Appellant consented, and additional items of personal property from the camper were found in the basement and house.

The State of Minnesota charged appellant with receiving stolen property. Appellant moved to suppress all evidence obtained by police as a result of the warrantless search and to dismiss for violation of his speedy-trial right. The district court denied appellant's suppression motion, holding that the officer's warrantless search of the camper was permissible under the plain-view doctrine and that appellant consented to the searches of his garage, basement, and house. The district court also denied appellant's motion to dismiss for violation of his speedy-trial right. After a trial, the jury found appellant guilty of receiving stolen property. Appellant filed a motion for a judgment of acquittal, arguing

3

that the evidence was insufficient to sustain a conviction. The district court denied appellant's motion. This appeal followed.

## ISSUES

I.    Did the district court err by denying appellant's motion to suppress the evidence obtained from the warrantless search of his property?

II.   Did the district court err by denying appellant's motion to dismiss for denial of his right to a speedy trial?

III.  Did the district court err by holding that the evidence was sufficient to convict appellant of receiving stolen property?

## ANALYSIS

### I.

Appellant argues that the district court erred by denying his motion to suppress the evidence that police obtained from the warrantless search of his property. "When reviewing a pretrial order on a motion to suppress, we review a court's factual findings under our clearly erroneous standard" and its "legal determinations, including a determination of probable cause, de novo." *State v. Milton*, 821 N.W.2d 789, 798 (Minn. 2012) (citation omitted). A factual finding is clearly erroneous if it lacks evidentiary support in the record, if it was induced by an erroneous view of the law, or if we are left with the definite and firm conviction that a mistake has been made. *State v. Roberts*, 876 N.W.2d 863, 868 (Minn. 2016).

The United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  A warrantless seizure is presumptively unreasonable unless an exception applies.  *Milton*, 821 N.W.2d at 798.

## A.

The district court found that the officer's actions with respect to the camper were permissible under the Fourth Amendment, because the plain-view doctrine was satisfied. Under the plain-view doctrine, police may seize an object that they believe to be the fruit or instrumentality of a crime without a warrant if (1) the object's incriminating nature is immediately apparent; (2) the police are legitimately in the position from which they view the object; and (3) the police have a lawful right of access to the object.  *Id.* at 799.

To seize an item under the plain-view doctrine, the police must have probable cause to believe the item seized is of an incriminating nature.  *State v. Holland*, 865 N.W.2d 666, 671 (Minn. 2015).  "Police have probable cause to seize an object in plain view if the facts available to the officer would warrant a [person] of reasonable caution in the belief that certain items *may* be . . . useful as evidence of crime."  *Id.* (quotation omitted).  To determine whether an object may be useful as evidence of a crime, an officer may consider background information that casts light on the nature of the object.  *Id.* at 672.

Appellant argues that the camper's incriminating nature became immediately apparent only after the officer and B.W.F. saw the bolts on the camper from his dirt driveway.  Respondent contends that the plain-view doctrine was satisfied when the officer

5

and B.W.F. viewed the camper from County Road D. While on County Road D, B.W.F. pointed out the camper to the officer. The record suggests that the officer, from a position on County Road D, confirmed that the make and model of the camper on appellant's property matched those of the camper that B.W.F. reported stolen. But these facts were insufficient to warrant a person of reasonable caution in the belief that the camper might be evidence of a crime. The district court's analysis supports this conclusion, as it determined "that the unique bolts on the camper were visible from the driveway, and after seeing the bolts, it was immediately apparent that the camper was the one stolen from B.W.F." The camper's incriminating nature became immediately apparent only after the officer and B.W.F. entered appellant's dirt driveway.

Next, we must determine whether the officer's position on the dirt driveway was lawful. Appellant argues that the driveway is curtilage and that the officer had no right to be present on it for the purpose of examining the camper. Respondent argues that the officer was legitimately present on the driveway, as the driveway is beyond the curtilage or, alternatively, impliedly open to the public.

"Although the Fourth Amendment refers only to 'persons, houses, papers and effects,' courts generally have held that it applies also to the 'curtilage.'" *State v. Crea*, 305 Minn. 342, 345, 233 N.W.2d 736, 739 (Minn. 1975). The curtilage is an area immediately and intimately connected to the home, such that a resident has a reasonable expectation of privacy in it. *Florida v. Jardines*, 133 S. Ct. 1409, 1414-15 (2013); *Milton*, 821 N.W.2d at 799; *Garza v. State*, 632 N.W.2d 633, 639 (Minn. 2001). The Minnesota

6

Supreme Court has recognized that the driveway to a house is within a home's curtilage. *State v. Lewis*, 270 N.W.2d 891, 897 (Minn. 1978); *Crea*, 305 Minn. at 346, 233 N.W.2d at 739. In *Crea*, the court recognized that police officers entered the curtilage when they walked onto the property's driveway. *Crea*, 305 Minn. at 346, 233 N.W.2d at 739. In *Lewis*, the court held, "the driveway to a house is part of its curtilage for purposes of executing a search warrant." *Lewis*, 270 N.W.2d at 897. By entering appellant's dirt driveway, the officer and B.W.F. entered the curtilage of appellant's home.

Generally, police may not search the curtilage without a warrant. *Milton*, 821 N.W.2d at 799. However, police with legitimate business may enter areas within the curtilage of the home if those areas are impliedly open to the public. *Crea*, 305 Minn. at 346, 233 N.W.2d at 739. The impliedly-open exception permits police to "walk on the sidewalk and onto the porch of a house and knock on the door if they are conducting an investigation and want to question the owner." *Id.* "[I]n such a situation the police are free to keep their eyes open and use their other senses." *Id.*

The district court cited *State v. Krech*, 403 N.W.2d 634 (Minn. 1987), for the proposition that "police do not need a warrant or even probable cause to approach a dwelling in order to conduct an investigation if they restrict their movements to places visitors could be expected to go (e.g. walkways, driveways, porches)" and concluded that the officer had a legitimate right to be on appellant's driveway under the impliedly-open exception. *Krech*, 403 N.W.2d at 637 (quotation omitted). Appellant argues that the impliedly-open exception cannot support the officer's entry into his driveway in light of

7

the United States Supreme Court's decision in *Jardines*. *See State v. Brist*, 812 N.W.2d 51, 54 (Minn. 2012) ("Supreme Court precedent on matters of federal law, including the interpretation and application of the United States Constitution, is binding on this court."). In *Jardines*, the Supreme Court explained that the legitimacy of an officer's entry into the curtilage is determined by considering the scope of the implied license that homeowners extend to visitors. *Jardines*, 133 S. Ct. at 1415-17. Like private citizens, an officer without a warrant has an implied license to enter the curtilage for the purpose of knocking on the home's door. *Id.* at 1415-16. However, police do not have a license to enter the curtilage where "their behavior objectively reveals a purpose to conduct a search." *Id.* at 1417. If the police enter the curtilage for the purpose of conducting a warrantless search, that search violates the Fourth Amendment. *Id.* at 1413, 1417-18.

This court has similarly recognized that the legitimacy of an officer's entry into the curtilage depends on his purpose for entering. In *Tracht v. Commissioner of Public Safety* and *Haase v. Commissioner of Public Safety*, we were asked to determine whether police officers violated the Fourth Amendment by their warrantless entries into defendants' garages. *Haase v. Comm'r of Pub. Safety*, 679 N.W.2d 743, 744-45 (Minn. App. 2004); *Tracht v. Comm'r of Pub. Safety*, 592 N.W.2d 863, 864-65 (Minn. App. 1999), *review denied* (Minn. July 28, 1999). Like a driveway, a garage is within a home's curtilage. *Haase*, 679 N.W.2d at 746; *Tracht*, 592 N.W.2d at 865.

In *Tracht*, officers received a report of a motor vehicle accident and a description of the vehicles involved. *Tracht*, 679 N.W.2d at 864. About two blocks from the accident

8

scene, the officers found a pickup truck registered in Tracht's name that was leaking radiator fluid and had a broken window and exploded airbag. *Id.* The driveway in which the truck was parked led to an attached garage, which had its large, overhead door open. *Id.* The officers entered the garage through the large doorway, knocked on the service door, and explained that they wished to speak with Tracht. *Id.* Because we determined that "[t]he officers entered the garage for the purpose of knocking on the service door and were not looking for evidence in the garage," we concluded that the officers' warrantless entry into the garage did not violate the Fourth Amendment. *Id.* at 865.

We reached a different conclusion in *Haase*. In *Haase*, an officer responded to a call that a vehicle had crossed the center line several times. *Haase*, 679 N.W.2d at 745. The officer ran a license-plate check, learned that the vehicle was registered to Haase, and went to Haase's residence, where he saw the reported vehicle pulling into the garage. *Id.* The officer parked, walked to the open garage, and stood at the garage's threshold, waiting for the driver to emerge. *Id.* While the officer was waiting, Haase caused the garage door to begin to close. *Id.* The officer interrupted its closing by kicking his leg out to trip the auto-reverse sensor. *Id.* After Haase exited the vehicle, the officer interviewed Haase, who exhibited signs of intoxication. *Id.* We determined that "the officer did not enter the garage to access a door to the home, but to investigate whether Haase was driving while impaired" and concluded that the officer's entry was unreasonable. *Id.* at 747.

Whether the officer was legitimately on appellant's dirt driveway depends upon his purpose for entering the property. The district court did not expressly determine for what

9

purpose the officer entered appellant's driveway. However, the district court's order and the record establish that the officer entered the driveway for the purpose of conducting a search.

The district court found that appellant's property contained two driveways. One driveway was at least partially asphalt and led to a garage, while the other was dirt and appeared to be used by cars carrying persons to the backdoor entrance to appellant's house and garage. After B.W.F. pointed to the camper from a spot on County Road D at the end of the driveway, the officer parked his squad some way into the dirt driveway. Rather than immediately approaching the front entrance of appellant's house, the officer chose to walk with B.W.F. down the dirt driveway toward the camper. This choice suggests that the officer entered appellant's property for the purpose of conducting a search.

The officer also performed several acts to identify the camper as B.W.F.'s stolen property before attempting to contact appellant. After arriving at a spot on the driveway next to the camper, the officer determined that the license plate had been removed. He checked the front of the camper, noted that the VIN was removed, and called the camper manufacturer to determine if the VIN might be stamped in another location. The officer learned that a partial VIN was stamped on the metal frame and located it. The officer went into the camper and found an item of personal property belonging to B.W.F. The officer then heard a noise coming from the garage, walked to the garage door, and knocked. The officer testified, "Once I verified it was the stolen camper, [I] tried to make contact with the homeowner." The officer's behavior in inspecting and entering the camper before

10

seeking the property owner objectively reveals that he entered appellant's property to conduct a warrantless search. Because the officer entered the dirt driveway for an improper purpose, his presence there was not lawful and the plain-view exception does not apply. The officer's search of the camper violated the Fourth Amendment.

**B.**

Appellant argues that all observations, evidence, and statements that the officer and B.W.F. obtained while on appellant's property must be suppressed under the exclusionary rule. Under the exclusionary rule, any evidence seized during an unlawful search cannot be used as proof against the victim. *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S. Ct. 407, 416 (1963). The exclusionary rule extends to indirect products of invasions and can be used to bar both physical and verbal evidence. *Id.* at 484-86, 416.

The district court concluded that the evidence obtained from the searches of appellant's garage, basement, and house was admissible. Relying upon its conclusion that the officer's actions with respect to the camper were permissible, the district court held that appellant's consent to the searches was not tainted by unlawful behavior and denied appellant's motion to suppress the evidence. Appellant argues that his consent was ineffective, because it was the fruit of an unlawful invasion.

A person's consent to a search is a well-settled exception to the warrant requirement. *State v. Barajas*, 817 N.W.2d 204, 217 (Minn. App. 2012), *review denied* (Minn. Oct. 16, 2012). However, we must consider whether police misconduct tainted the consent. *Id.*

> When the police obtain a person's consent to search after unlawful police conduct has occurred, the state must

11

demonstrate both (1) that the subsequently obtained consent was voluntarily given and (2) that the connection between the unlawful conduct and the evidence is so attenuated as to dissipate the evidence of the 'taint' of the unlawful conduct.

*Id.* Whether consent is voluntary is a question of fact that must be determined by considering the totality of the circumstances. *Id.* at 218. To determine whether taint is purged, "we consider (1) the temporal proximity between the illegal search or seizure and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Id.* (quotation omitted).

The record does not clearly establish whether appellant's consent was voluntary. Even assuming it was voluntary, respondent must additionally demonstrate that the connection between the unlawful conduct and the challenged evidence is so attenuated as to dissipate the taint of the unlawful conduct. *Id.* Respondent cannot meet its burden.

We first consider the temporal proximity between the unlawful search and appellant's consent. After the officer inspected and entered the camper, he walked to the garage door and knocked. Appellant answered and identified himself as the property owner. The officer asked if appellant owned the camper, and appellant explained that he was storing it for a friend. According to the officer's testimony, he told appellant and another man who was in the garage that the camper was stolen property, and he learned that the propane tank from the camper had been moved into the garage. The officer asked appellant if he could search the garage, and appellant consented. Because only this conversation separated the officer's unlawful search of the camper and appellant's consent

12

to the search of his garage, the temporal proximity factor weighs against finding the taint purged.

We next determine whether intervening circumstances would have led the police to independently discover the evidence. *Id.* It is unclear whether the officer would have questioned appellant about the camper and requested to search his property but for the illegal search of the camper. This factor weighs slightly against finding the taint purged.

Finally, we consider the purpose and flagrancy of the police misconduct. *Id.* "[P]ermitting the police to obtain consent *after* conducting an unlawful search so as to circumvent the exclusionary rule, even if the police conducted the unlawful search in good faith, would undermine the constitutional limitation on unreasonable searches and seizures and the purpose of the exclusionary rule." *Id.* Because the record shows that the officer entered appellant's property for the purpose of conducting a warrantless search, the final factor weighs against finding the taint purged.

All three factors indicate that the taint of the unlawful search of the camper had not been purged when appellant gave his initial consent to the search of his property. Because respondent cannot show that the taint was purged, respondent cannot claim the consent exception to the warrant requirement. The district court erred by admitting the evidence obtained from the searches of appellant's garage, basement, and house.

Appellant argues that the district court's failure to suppress the unlawfully-obtained evidence requires reversal. We agree. It appears that the vast majority of the evidence obtained was due to the illegal searches, requiring reversal.

13

## II.

Appellant asserts that the district court erred by denying his motion to dismiss for violation of his right to a speedy trial. "Criminal defendants have the right to a speedy trial under the constitutions of both the United States and Minnesota." *State v. Taylor*, 869 N.W.2d 1, 19 (Minn. 2015) (citing U.S. Const. amend. VI; Minn. Const. art. I, § 6). We review claims of Sixth Amendment violations de novo. *Id.* Minnesota has adopted the *Barker* test, under which "we must consider: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted his or her right to a speedy trial; and (4) whether the delay prejudiced the defendant." *Id.* (quotation omitted). No factor is necessary or sufficient; all must be considered with other relevant circumstances. *Id.*

"The delay in speedy-trial cases is calculated from the point at which the sixth amendment right attaches: when a formal indictment or information is issued against a person or when a person is arrested and held to answer a criminal charge." *State v. Jones*, 392 N.W.2d 224, 235 (Minn. 1986). A delay of seven months is long enough to trigger the consideration of the other *Barker* factors. *Id.* Respondent filed its complaint on December 5, 2011, and appellant's trial commenced on September 22, 2014. Over 33 months passed between the attachment of appellant's Sixth Amendment right and the commencement of the trial. This delay triggers consideration of the other *Barker* factors.

When considering the delay, "the key question is whether the government or the criminal defendant is more to blame." *Taylor*, 869 N.W.2d at 19 (quotation omitted). "Delays caused by defense motions generally weigh against the defendant." *State v. Hahn*,

14

799 N.W.2d 25, 32 (Minn. App. 2011), *review denied* (Minn. Aug. 24, 2011).  When the defendant's actions cause the overall delay in bringing the case to trial, there is no speedy-trial violation.  *State v. DeRosier*, 695 N.W.2d 97, 109 (Minn. 2005).  When the delay weighs against the state, different weights should be assigned to different reasons.  *Taylor*, 869 N.W.2d at 20.  "[A] [d]eliberate delay to hamper the defense weighs heavily against the prosecution, while neutral reason[s] such as negligence or overcrowded courts weigh less heavily."  *Id.* (quotations omitted).  "[A]dministrative delay, by itself, is generally insufficient to violate a defendant's speedy-trial right in the absence of a deliberate attempt to delay trial."  *Hahn*, 799 N.W.2d at 32.

The delay of appellant's case had several causes, some chargeable to respondent and others chargeable to appellant.  The record indicates that the officer who searched appellant's property was unavailable on the originally scheduled date of the suppression hearing.  The delay caused by the officer's unavailability is chargeable to respondent.  *Taylor*, 869 N.W.2d at 20 (finding the delay caused by the unavailability of the state's witness was attributable to the state).  The district court's congestion and calendaring difficulties also contributed to the delay.  This delay is similarly chargeable to respondent.

However, appellant also significantly contributed to the delay.  Appellant concedes that approximately seven months of delay is attributable to him, as his original trial date was moved mainly to accommodate the schedule of his attorney and her untimely motion.  Appellant is also responsible for the delay caused by his counsel's decision to leave the public defender's officer and her request to reschedule the case.  Finally, the delay caused

by appellant's counsel's request for a continuance, unavailability, and selection of the later trial date offered by the district court is similarly chargeable to the appellant.

In sum, the officer's unavailability and court congestion caused considerable delay. Because there is no evidence of an intent to hamper the defense, this delay weighs less heavily against respondent. However, a significant amount of the delay is chargeable to appellant, as substantial delay was caused by his counsel's late motion for suppression and unavailability, as well as changes in appellant's counsel. The second *Barker* factor only slightly favors appellant.

A defendant's assertion of his right to a speedy trial is entitled to strong evidentiary weight in determining whether the right has been deprived. *State v. Friberg*, 435 N.W.2d 509, 515 (Minn. 1989). "[T]he Supreme Court has looked for any action whatever . . . that could be construed as the assertion of the speedy trial right." *State v. Windish*, 590 N.W.2d 311, 317 (Minn. 1999) (quotation omitted). However, a defendant's statement that he is ready to go to trial now, without more, is not clear enough to be construed as an assertion of the right to a speedy trial. *State v. Rhoads*, 802 N.W.2d 794, 806 (Minn. App. 2011), *rev'd on other grounds*, 813 N.W.2d 880 (Minn. 2012).

Appellant argues that he asserted his speedy-trial right at the November 18, 2013 hearing when his counsel said, "We're prepared for trial." However, this statement does not constitute a demand. Because appellant does not argue that he asserted his right at any other time, he failed to demand a speedy trial. "When a defendant moves for dismissal, but does not move for a speedy trial, this factor will not favor the defendant." *State v.*

16

*Cham*, 680 N.W.2d 121, 125 (Minn. App. 2004), *review denied* (Minn. July 20, 2004). Because appellant moved for dismissal without demanding a speedy trial, the third *Barker* factor weighs against appellant.

We consider three interests to determine "whether a defendant suffered prejudice: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) preventing the possibility that the defense will be impaired." *Taylor*, 869 N.W.2d at 20 (quotation omitted). The final interest, preventing the possibility of impairing the defendant's case, is the most serious. *Id.* at 20. Because it is difficult to prove exactly how a case was impaired by delay, a defendant is not required to prove specific prejudice. *State v. Griffin*, 760 N.W.2d 336, 341 (Minn. App. 2009).

Oppressive pretrial incarceration is not at issue here, as appellant was granted a release on his own recognizance. Appellant asserts he was prejudiced, because he suffers from renal failure, and the anxiety and concern he endured while awaiting trial for over 33 months affected his health. Appellant does not argue that his case was impaired by the delay. Where a defendant's only argument regarding the final *Barker* factor is a bare assertion that he suffered anxiety and concern over his future and the handling of his case, the defendant has failed to show that he was prejudiced by the delay. *Hahn*, 799 N.W.2d at 32-33. Although appellant's assertion of prejudice is based upon the stress he experienced while awaiting trial, he explains that this stress affected his health and offers more than a bare assertion of anxiety. Considering all of the prejudice factors together,

17

appellant has shown that he suffered a minimal amount of prejudice. The final *Barker* factor only slightly favors appellant.

In sum, the *Barker* factors show that appellant's right to a speedy trial was not violated. Although the 33-month period between the filing of the complaint and trial is significant, appellant contributed to much of the delay, failed to demand a speedy trial, and offered only his increased anxiety and poor health to show prejudice. The district court did not err by denying appellant's motion to dismiss for violation of his speedy-trial right.

### III.

Appellant argues that the evidence was insufficient to convict him of receiving stolen property, because the evidence failed to prove that he knew or had reason to know that the camper was stolen property. Because we hold that the district court erred by denying appellant's motion to suppress the evidence obtained from the warrantless search of appellant's property, we do not determine whether the evidence produced at trial was sufficient to convict appellant.

### D E C I S I O N

The district court erred by denying appellant's motion to suppress the evidence obtained from the warrantless search of his property. Because the officer entered appellant's property for the improper purpose of conducting a warrantless search, the plain-view doctrine cannot justify the search of the camper. Appellant's consent to the search of his property was tainted by the unlawful search of the camper and cannot justify the searches of his garage, basement, and house.

18

We hold that the district court did not err by denying appellant's motion to dismiss for violation of his speedy-trial right, as the balancing of the *Barker* factors shows that no violation occurred. Because we conclude that the district court should have suppressed the evidence obtained from the warrantless search, we reverse and we do not determine whether the evidence produced at trial was sufficient to convict appellant.

**Affirmed in part, reversed in part, and remanded.**