CHUTICH, Justice.
Respondent Quentin Todd Chute was convicted of possession of a stolen camper trailer. He challenges the district court's denial of his motion to suppress evidence obtained when an officer entered his property, examined the stolen camper, and then, after obtaining Chute's consent, searched his home. Chute contends that the officer's examination of the camper violated his Fourth Amendment rights and tainted his subsequent consent to the officer's search of his home. The district court concluded that the officer's entry onto Chute's property was lawful because the camper was on a driveway that was impliedly open to the public, and that the officer had authority to seize the camper under the plain-view doctrine. The court of appeals reversed, and the State sought review.
*581 We conclude that because the officer's conduct objectively amounted to a search and was not a permissible "knock-and-talk,"[1] the warrantless search violated Chute's Fourth Amendment rights. We therefore affirm the court of appeals.
FACTS
In July 2011, Maplewood resident B.F. discovered that his pop-up tent camper had been stolen, and he reported the theft to the police. Several months later, B.F. was driving on County Road D in Maplewood when he saw what he thought was his camper sitting in Chute's backyard.
Chute's house is located between two other houses on County Road D, facing north. His lot is bordered on three sides by a tall, opaque fence on the east side, a small pond on the south side, and some trees on the west side. The north side of the property is unfenced and borders County Road D, which has no curb.
The district court found that the property has two driveways. The first, on the west side of the house, is a short asphalt driveway leading to a detached garage. The second is a dirt driveway accessed from the county road, running along the home's east side, and looping around in the backyard. The district court found that the dirt driveway is "well-worn" and forms "a turnaround or circle" in the backyard. The camper was parked at the end of the dirt driveway, near the southeast corner of the backyard. Two other cars were parked near the camper on the dirt driveway. A second garage is located in the back of the house on the west side of the lot.
After spotting the camper, B.F. made a U-turn and drove past again to verify that it was his stolen camper. B.F. later testified that he could recognize the camper from County Road D because he could see a series of bolts that he had installed along the rear overhang of the roof when making repairs on the camper. B.F. called the police.
When the responding officer arrived, he verified from the end of the dirt driveway, while still on County Road D, that the camper on Chute's property matched the description of the stolen trailer in the police report made at the time of the theft. The officer then drove onto the dirt driveway and parked his squad car approximately halfway down the driveway, which he estimated to be about 200 feet from County Road D. The officer and B.F. then walked to the camper. At some point before they reached the camper, B.F. told the officer about the unique set of bolts on the trailer.
When he reached the camper, the officer noticed that the camper's license plate and vehicle identification number (VIN) had been removed. He called the manufacturer and learned that a partial VIN was stamped on the camper's frame. The officer located the partial VIN, which was consistent with that of B.F.'s stolen camper. The officer then entered the camper and located an item of B.F.'s personal property.
The officer testified that, once he verified that the camper was the one stolen from B.F., he "tried to make contact with the homeowner." He started walking toward the back of the home to knock on the door, but when he heard voices from the garage in the backyard, he decided to knock there instead. Chute answered the door and, after a discussion, allowed the officer to search the garage. After finding several items of B.F.'s personal property *582 from the camper in the garage, the officer asked Chute for permission to search his home, and Chute consented. The officer found additional items of personal property belonging to B.F. in Chute's home.
The State charged Chute with possession of stolen property valued at over $1,000. See Minn. Stat. § 609.53, subd. 1 (2016) ; Minn. Stat. § 609.52, subd. 3(3)(a) (2016). Chute moved to suppress "all evidence found by police pursuant to a warrantless search" of his property. After a hearing, the district court made the findings described above. Without explicitly finding that the dirt driveway was within the curtilage of Chute's home, the district court found that, even if it were part of the curtilage, the driveway was "impliedly open to the public" because it appeared that "the area in question was regularly used by cars carrying persons seeking a back door entrance to the house and garage." The court relied on evidence that the area was a "well-worn dirt area," that a "definable pathway" existed leading to the turnaround area at the back of the house, and that two other vehicles were parked near the camper. The district court further found that "it is very clear to the court that the unique bolts on the camper were visible from the driveway, and after seeing the bolts, it was immediately apparent that the camper was the one stolen" from B.F.
The district court concluded that, under the plain-view doctrine, the officer had authority to seize the camper "provided he had lawful right of access to it." Because the camper was located on a driveway that was "impliedly open to the public to access [Chute's] home," the district court concluded that the officer "had a lawful right of access to the camper." As a result, the court denied Chute's motion to suppress. After a trial, a jury found Chute guilty of possessing stolen property. See Minn. Stat. § 609.53, subd. 1.
The court of appeals reversed in relevant part. State v. Chute , 887 N.W.2d 834 (Minn. App. 2016). The court of appeals held that the plain-view doctrine did not justify the officer's search of the camper because he did not have a lawful right of access to it. Id. at 843. Although the driveway was within the home's curtilage, the court said, and "[g]enerally, police may not search the curtilage without a warrant," id. at 841 (citing State v. Milton , 821 N.W.2d 789, 799 (Minn. 2012) ), "police with legitimate business may enter areas within the curtilage of the home if those areas are impliedly open to the public," id. (citing State v. Crea , 305 Minn. 342, 233 N.W.2d 736, 739 (1975) ). Whether an officer's entry onto curtilage is legitimate, the court stated, is "determined by considering the scope of the implied license that homeowners extend to visitors." Id. (citing Florida v. Jardines , 569 U.S. 1, 6-11, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) ). The court concluded that the officer exceeded the scope of the implied license to enter the driveway because he entered with the purpose to conduct a search. Id. at 842.
The court further held that the unlawful search of the camper tainted Chute's subsequent consent to the search of his home, and therefore all evidence from that search should also be suppressed. Id. at 843-44. The court of appeals declined to address whether the remaining evidence was sufficient to support Chute's conviction and remanded to the district court. Id. at 846-47.
The State filed a petition for review, arguing that the court of appeals erred when it held that the officer's examination of the camper was an unlawful search. We granted review.
*583 ANALYSIS
I.
When reviewing a pretrial order denying a motion to suppress, we review the district court's factual findings for clear error and its legal determinations de novo. Milton , 821 N.W.2d at 798. At issue is whether the officer's examination of the camper violated the Fourth Amendment.
The Fourth Amendment to the Constitution of the United States protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches are presumed to be unreasonable unless one of "a few specifically established and well delineated exceptions" applies. Katz v. United States , 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ; see also State v. Licari , 659 N.W.2d 243, 250 (Minn. 2003) (citing Katz for the same proposition).
Although the parties agree that the officer acted without a warrant, they disagree as to whether the officer's actions were a "search" within the meaning of the Fourth Amendment. Under the Fourth Amendment, a search occurs when government agents seek to obtain information by invading a person's reasonable expectation of privacy, Katz , 389 U.S. at 360, 88 S.Ct. 507 (Harlan, J. concurring), or by trespassing upon one of the kinds of property enumerated in the Fourth Amendment, United States v. Jones , 565 U.S. 400, 404-05, 411, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012).[2]
The parties disagree about whether the officer performed a trespassory search of Chute's home when he entered the property to examine the camper. This question requires us to consider whether the camper was located on property that was afforded the constitutional protections of the home. If we conclude that the camper was located on such property, known as the "curtilage," we must then consider whether an exception to the warrant requirement would allow the officer to examine the camper without a warrant.[3] We address each question in turn.
A.
The State contends that the camper was parked too far from Chute's home to be protected by the Fourth Amendment. The "land immediately surrounding and associated with the home," the curtilage, is "part of the home itself for Fourth Amendment purposes." Oliver v. United States , 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). If the camper was located on the curtilage, the officer's actions *584 must comply with the Fourth Amendment. If the camper was outside the curtilage, however, the Fourth Amendment would not govern the officer's examination. See id. at 183, 104 S.Ct. 1735 (concluding that a governmental intrusion on an open field is not a "search" within the meaning of the Fourth Amendment).
To determine whether the camper was located within the curtilage of the property, we look to "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." United States v. Dunn , 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). An area has a sufficiently close connection to the home if it harbors the "intimate activity associated with the sanctity of a [person's] home and the privacies of life." Oliver , 466 U.S. at 180, 104 S.Ct. 1735 (citation omitted) (internal quotation marks omitted). "[F]or most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage-as the area around the home to which the activity of home life extends-is a familiar one easily understood from our daily experience." Id . at 182 n.12, 104 S.Ct. 1735.
The Supreme Court has identified four relevant factors to determine whether a disputed area falls within the curtilage: "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by."
*585 Dunn , 480 U.S. at 301, 107 S.Ct. 1134. This test is not a rigid one, see id ., but is designed to "determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." Oliver , 466 U.S. at 180, 104 S.Ct. 1735. Applying these factors to Chute's backyard and dirt driveway, we conclude that the camper was parked in the curtilage of the single-family home.
The first Dunn factor-"the proximity of the area claimed to be curtilage to the home"-weighs in Chute's favor. 480 U.S. at 301, 107 S.Ct. 1134. The part of Chute's dirt driveway on which the trailer was parked is in close proximity to his suburban home. Aerial photos show that Chute does not live on a large piece of rural property; he lives in a single-family home in a Saint Paul suburb. His dirt driveway runs directly next to the eastern side of the home and then forms a turnaround behind Chute's home in the backyard. The backyard and driveway of a home are often considered to be within the curtilage of a home. See , e.g. , State v. Lewis , 270 N.W.2d 891, 897 (Minn. 1978) (holding that "the driveway to a house is part of its curtilage for purposes of executing a search warrant"); Crea , 233 N.W.2d at 739-40 (recognizing that the driveway of a home was within the curtilage); see also United States v. Carter , 360 F.3d 1235, 1241 (10th Cir. 2004) (recognizing the backyard as part of the curtilage of the home); Dow Chem. Co. v. United States , 749 F.2d 307, 314 (6th Cir. 1984), aff'd , 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986) ("The backyard and area immediately surrounding the home are really extensions of the dwelling itself."); State v. Walker , 154 Wis.2d 158, 453 N.W.2d 127, 138 (1990) (holding that a backyard was within the curtilage of the home), abrogated on other grounds by State v. Felix , 339 Wis.2d 670, 811 N.W.2d 775, 790 (2012).
The second Dunn factor-"whether the area is included within an enclosure surrounding the home"-weighs slightly in Chute's favor. 480 U.S. at 301, 107 S.Ct. 1134. Aerial photographs admitted at trial show that the backyard and dirt driveway are bordered on three sides by a tall, opaque fence on the east side, quite close to where the trailer was parked, a wooded area with a pond to the south, and trees to the west side. Although a privacy fence runs along only one side of Chute's property, the fence, pond, and trees clearly demark Chute's backyard and provide privacy. See Daughenbaugh v. City of Tiffin , 150 F.3d 594, 599 (6th Cir. 1998) (explaining that enclosures formed by natural barriers are entitled to the same protection as those formed by artificial barriers); United States v. Reilly , 76 F.3d 1271, 1277-78 (2nd Cir. 1996) (holding that a dilapidated fence, hedgerows, and woods were an enclosure).
The third Dunn factor-"the nature of the uses to which the area is put"-weighs heavily in Chute's favor. 480 U.S. at 301, 107 S.Ct. 1134. The district court found that the driveway and turnaround were "regularly used by cars carrying persons seeking a back door entrance to the house and garage." From its well-worn appearance, the dirt driveway and turnaround suggest that Chute's main route of entering his home was through the backyard and back door. Moreover, photographs showed that Chute stored scrap materials near the turnaround. In addition, the district court specifically found that the area of Chute's backyard where the camper was located was "part of a turnaround or circle that is part of the driveway." An exhibit shows that in the center of that turnaround was a fire pit with a horizontal log upon which persons could sit to enjoy a fire. These activities are closely related to the home and associated with the privacies of life. See Widgren v. Maple Grove Twp. , 429 F.3d 575, 582 (6th Cir. 2005) (relying, in part, on the existence of a fire pit in area near a house in holding that the area was within the curtilage).
The last factor-"the steps [Chute took] to protect the area from observation by people passing by"-is less conclusive. 480 U.S. at 301, 107 S.Ct. 1134. The camper was protected from view on three sides by a privacy fence to the east and by trees to the south and west. Chute's home partially blocked the view of his backyard from the north, but the dirt driveway where the camper was parked is visible from County Road D if an observer stands at its northern end and looks directly down it. The curtilage of a home, however, need not be completely shielded from public view. Homeowners "may expose portions of the curtilage of [their] home[s] to public view while still maintaining some expectation of privacy in those areas." United States v. Wells , 648 F.3d 671, 678 (8th Cir. 2011).
Applying the Dunn factors to the unique facts of this case and then balancing them, we conclude that the area of Chute's backyard on which the camper was parked was "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protections." Dunn , 480 U.S. at 301, 107 S.Ct. 1134. It was curtilage.
B.
Having concluded that the camper was located on the curtilage of Chute's property and within the protections of the Fourth Amendment, we must next consider whether the officer's investigation "was accomplished through an unlicensed physical intrusion." Jardines , 569 U.S. at 7, 133 S.Ct. 1409. Central to this question is whether Chute had given the officer express or implied license to enter onto the curtilage. Id. at 8, 133 S.Ct. 1409.
The Supreme Court has examined Fourth Amendment protections using two separate analytical frameworks: the *586 reasonable-expectation-of-privacy analysis and, more recently, a property-rights analysis. The government might violate the Fourth Amendment by intruding into a space where the defendant has a "reasonable expectation of privacy," Katz , 389 U.S. at 360, 88 S.Ct. 507 (Harlan, J., concurring), or by "physically intruding on a constitutionally protected area" to gain information, Jones , 565 U.S. at 406 n.3, 132 S.Ct. 945. The latter form of Fourth Amendment violation has been referred to as the "classic trespassory search,"[4] Jones , 565 U.S. at 412, 132 S.Ct. 945, violating the "property-rights baseline" of Fourth Amendment protection, Jardines , 569 U.S. at 11, 133 S.Ct. 1409.
In Jardines , the Supreme Court recognized that a person is typically invited to "approach the home by the front path, knock promptly, wait briefly to be received and then (absent invitation to linger longer) leave." 569 U.S. at 8, 133 S.Ct. 1409. The scope of the implied license to approach includes all routes by which homeowners accept visitors to their property. United States v. Shuck , 713 F.3d 563, 567 (10th Cir. 2013). The particular layout and use of a property may show that the homeowner allows visitors to seek them out from the back door or other locations on the property. See id. at 568 (finding route to back door was a "normal route of access" for visitors).
In this case, the district court found that Chute had given members of the public an implied license to access his land to seek "a back door entrance to the house and garage" by using the driveway and turnaround area on which the camper was parked. The court supported this factual finding by noting that the driveway was a "well-worn dirt area" that exhibited a "definable pathway," and that two other vehicles were parked near the camper. Cf. N. States Power Co. v. Franklin , 265 Minn. 391, 122 N.W.2d 26, 30 (1963) (stating that whether a landowner impliedly consented to allow another to enter his or her land is a question of fact). Because the district court's finding that Chute granted the public an implied license to access his land by using this dirt driveway is supported by the record, it is not clearly erroneous. State v. Jenkins , 782 N.W.2d 211, 223 (Minn. 2010) ("We review the district court's factual findings for clear error....").
Because Chute had impliedly granted the public access to his backyard to seek "a back door entrance to the house and garage," we must next consider whether the officer acted within the scope of this implied license while on the property. The scope of the implied license "is limited not only to a particular area but also to a specific purpose." Jardines , 569 U.S. at 9, 133 S.Ct. 1409. The license, therefore, has a spatial limitation and a purpose limitation. To determine whether the officer acted within the limitations of this implied license, we must determine the officer's purpose, objectively, for entering the curtilage. See id. at 10, 133 S.Ct. 1409 (looking to the behavior of an officer to determine whether, objectively, the officer's purpose complied with the implied license). Based on the evidence, we conclude that the officer's intrusion violated *587 the limitations of the implied license to enter Chute's property.
Viewed objectively, the evidence demonstrates that the officer's purpose for entering the curtilage was to conduct a search. Photographs in the record show that the camper was parked at the end of Chute's driveway, past the house, in the back corner of Chute's backyard. To inspect the camper, the officer had to deviate substantially from the route that would take him to the back door of the house or to the garage. The officer walked directly to the camper, inspected it thoroughly, both inside and out, and only turned back toward the house when he was satisfied that the camper was stolen. Anyone observing the officer's actions objectively would conclude that his purpose was not to question the resident of the house, but to inspect the camper, "which is not what anyone would think he had license to do."[5] Jardines , 569 U.S. at 10, 133 S.Ct. 1409 ; see also Crea , 233 N.W.2d at 739 (holding that the intrusion of police onto a driveway, notwithstanding that the driveway was part of the curtilage, did not violate the Fourth Amendment because police had license to cross the driveway to contact the homeowner).
The federal circuits have split as to whether an implied license requires an officer to first approach the front door of a house when attempting a "knock-and-talk."[6] In United States v. Wells , the Eighth Circuit Court of Appeals held that officers violated the scope of an implied knock-and-talk license when they "made no attempt to raise Wells at the front door," and instead walked directly "to the back corner of the home from where they had a view of the entire backyard." 648 F.3d at 680. The court explained: "To the extent that the 'knock-and-talk' rule is grounded in the homeowner's implied consent to be contacted at home, we have never found such consent where officers made no attempt to reach the homeowner at the front door." Id. at 679.
Like the Eighth Circuit, we have never held that a "knock-and-talk" license allows officers to proceed to the backyard of the property before attempting to contact the resident at the front door. But even assuming that the officer was permitted to bypass the front door of Chute's house, he was not permitted to stray from a visitor's normal route of access. As even the dissent in Jardines recognized, "[a] visitor cannot traipse through the garden, meander into the backyard, or take other circuitous detours *588 that veer from the pathway that a visitor would customarily use." 569 U.S. at 19, 133 S.Ct. 1409 (Alito, J., dissenting); accord id. at 9, 133 S.Ct. 1409 (explaining that "social norms that invite a visitor to the front door do not invite him there to conduct a search"). By moving away from the path that a visitor would reasonably use to access the house or garage, the officer violated the spatial limitations of the implicit license.
The officer also violated the temporal limitations of the implicit license. In Jardines , the Court noted that an implied license authorizes visitors to enter the curtilage "briefly," unless they receive an "invitation to linger longer." Id. at 8, 133 S.Ct. 1409. The dissent also focused on temporal limitations, stating that the license "is limited to the amount of time it would customarily take to approach the door, pause long enough to see if someone is home, and (if not expressly invited to stay longer), leave." Id. at 20, 133 S.Ct. 1409 (Alito, J., dissenting). Although the record does not clearly show how long the officer remained by the camper, he was there long enough to inspect the missing license plate and VIN sticker, call the manufacturer and locate the partial VIN on the frame, and go inside the camper to search for B.F.'s personal property. The officer spent several minutes, at the very least, inspecting the camper, which exceeds the amount of time that visitors were impliedly invited to stay on Chute's property before actively seeking him out. The officer, therefore, also violated the time limitations of the implicit license.
In sum, under Jardines , the officer's implied license to enter Chute's property was limited to what "any private citizen might do" when visiting another's property. 569 U.S. at 8, 133 S.Ct. 1409 (citation omitted) (internal quotation marks omitted). Just as a private citizen would not be impliedly invited to explore Chute's backyard and snoop in a parked camper, the officer had no right to inspect the camper without attempting to contact Chute first. See id. at 9 n.3, 133 S.Ct. 1409. That conduct is beyond the objectively reasonable scope of any implied license to enter Chute's property.
CONCLUSION
For the foregoing reasons, we affirm the decision of the court of appeals.
Affirmed.

"Knock-and-talk" is a procedure used by law enforcement officers that involves "knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence." Florida v. Jardines , 569 U.S. 1, 21, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013).

Although the parties discuss the plain-view exception, it is not relevant to our analysis because it is an exception to the warrant requirement for a seizure , not for a search , of property. The plain-view doctrine enables law enforcement to make a warrantless seizure if officers are "lawfully in a position from which they view [the] object, if [the object's] incriminating character is immediately apparent, and if the officers have a lawful right of access to the object." Minnesota v. Dickerson , 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). As the Court stated in Horton v. California , "[i]f 'plain view' justifies an exception from an otherwise applicable warrant requirement, ... it must be an exception that is addressed to the concerns that are implicated by seizures rather than by searches." 496 U.S. 128, 134, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). No seizure occurred here.

Although the district court assumed without deciding that the camper was located on the curtilage, the court's factual findings and the exhibits in the record are more than sufficient for us to determine, as a matter of law, whether the camper was located within the curtilage. We note that neither party requested a remand and both briefed the curtilage issue based on the findings and the record.

This term "trespassory search" is a misnomer because a violation of the Fourth Amendment can occur without triggering a separate violation of a state's laws governing criminal trespass. See, e.g. , Minn. Stat. § 609.605, subd. 1(b)(3) (2016) ("A person is guilty of a misdemeanor if the person intentionally: ... trespasses on the premises of another and, without claim of right, refuses to depart from the premises on demand of the lawful possessor....").

In some cases, circumstances may imply that a person has consent to approach and to investigate objects on the curtilage of a home. For example, a prominently placed "For Sale" sign could signal an invitation to inspect the merchandise. Cf. State v. Hiebert , 156 Idaho 637, 329 P.3d 1085, 1092 (Idaho Ct. App. 2014) (holding that a visitor to defendant's home, which was also a salvage yard, would reasonably "feel free to look around and closely inspect items they may be interested in purchasing"). The State has presented no evidence that visitors to Chute's property were impliedly invited to inspect the camper.

Compare Covey v. Assessor of Ohio Cty. , 777 F.3d 186, 193 (4th Cir. 2015) ("An officer may also bypass the front door (or another entry point usually used by visitors) when circumstances reasonably indicate that the officer might find the homeowner elsewhere on the property."), and Shuck , 713 F.3d at 568 ("Here, the evidence showed that by approaching the back door as they did, the officers used the normal route of access, which would be used by anyone visiting this trailer."), with Carman v. Carroll , 749 F.3d 192, 199 (3d Cir. 2014) ("The 'knock and talk' exception requires that police officers begin their encounter at the front door, where they have an implied invitation to go."), rev'd on other grounds , --- U.S. ----, 135 S.Ct. 348, 190 L.Ed.2d 311 (2014).