*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1044**

State of Minnesota,
Respondent,

vs.

Jude Jerome Lague,
Appellant.

**Filed April 15, 2024**
**Affirmed**
**Bjorkman, Judge**

Carver County District Court
File No. 10-CR-22-443

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mark Metz, Carver County Attorney, Kelly J. Small, Assistant County Attorney, Chaska, Minnesota (for respondent)

Isabel L. McClure, Brandt Kettwick Defense, Anoka, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Larkin, Judge; and Bjorkman, Judge.

**NONPRECEDENTIAL OPINION**

**BJORKMAN**, Judge

Appellant challenges his conviction of driving while impaired (DWI) following a stipulated-facts trial. He argues that his Fourth Amendment rights were violated when law-enforcement officers entered the curtilage of his home to inquire about a hit-and-run

accident and the district court erred by denying his motion to suppress evidence obtained as a result of the encounter. We affirm.

**FACTS**

On June 3, 2022, shortly after 6:00 p.m., two Carver County deputy sheriffs were dispatched to a hit-and-run accident at Lola's Lakehouse in Waconia. When they arrived, the reporting party told them that a Porsche hit a black Chevy Traverse before taking off at a high rate of speed. The reporting party provided license-plate numbers for both vehicles and a description of the Porsche driver. The Porsche was registered to appellant Jude Jerome Lague at an address in Mayer.

Deputy Johnson arrived first at the Mayer address and pulled into the driveway. The Porsche was parked in the grass in front of the house but still running. And a male matching the description of the driver involved in the accident, later identified as Lague, was asleep in the driver's seat. Deputy Johnson used a sternum rub to wake Lague, who was disoriented and smelled like he had consumed alcoholic beverages.

When Deputy Klukas arrived at the scene, he saw Deputy Johnson's squad car parked near the Porsche. Lague was still seated in the Porsche, and Deputy Klukas observed black paint transfer on the side of the vehicle consistent with the reported incident. After Lague admitted consuming alcohol and failed field sobriety tests, the deputies arrested him for DWI.

Respondent State of Minnesota charged Lague with DWI, in violation of Minn. Stat. § 169A.20, subd. 1(1), (5) (2020), and leaving the scene of an accident without providing information, in violation of Minn. Stat. § 169.09, subd. 3(a) (2020). Lague moved the

2

district court to suppress evidence of his intoxication, arguing that the deputies violated his Fourth Amendment rights by entering his property that was "guarded" by a no trespassing sign.

The district court held a contested omnibus hearing during which it heard testimony from Deputy Klukas and Lague and received stipulated-to exhibits, including Deputy Klukas's body-camera and squad-camera videos, and photographs of Lague's house and the surrounding property. Lague's house is located just north of 7th St. NW, a public street that runs east to west and intersects with Bluejay Ave.



This aerial photo shows Lague's house (red map dot), 7th St. NW (indicated by the red arrows), and Bluejay Ave. (indicated by the blue arrow).[1]

---

[1] The red and blue arrows were added by this court to help explain the image.



This photo depicts two signs Lague posted along 7th St. NW between Bluejay Ave. and his house. The sign in the foreground is on the south side of the street and reads "PRIVATE PROPERTY NO TRESPASSING." The second sign, pictured in the distance (indicated by the red arrow),[2] is on the north side of the street and reads "NOTICE THIS PROPERTY IS PROTECTED BY VIDEO SURVEILLANCE." Neither sign is in front of Lague's house. Lague's house is not visible from the no trespassing sign. And there is no evidence as to who owns the land on which the signs are posted.

Following the hearing and post-hearing briefing, the district court denied Lague's suppression motion, concluding that the deputies did not violate the Fourth Amendment by approaching Lague in front of his house. The district court found that 7th St. NW is not Lague's driveway. Rather, it is a public street with no barriers for traffic. And the court found that Lague's "driveway" is the unpaved area in front of his house where the vehicles were parked and the deputies encountered him. Based on these factual determinations, the district court found that the deputies entered the curtilage of Lague's house but that the

---

[2] The red arrow was added by this court to help explain the image.

4

area is "impliedly open" because "[a]ny reasonable person would take the exact same route that law enforcement took to contact [Lague]." The court further found that Lague's "no trespassing sign alone [was] not sufficient to prevent entry." And the court concluded that the deputies acted within the scope of the implied license to enter the property because they were conducting "legitimate police business," took a "direct route down 7th Street NW to make contact with [Lague]," and "acted out of concern for [Lague's] well being and reasonably conducted a DWI investigation."

While maintaining his plea of not guilty, Lague submitted the case for trial on stipulated facts in order to preserve the suppression issue for appeal.[3] The district court found him guilty as charged.

Lague appeals.

## DECISION

On appeal of a pretrial order denying a motion to suppress, "we review the district court's factual findings for clear error and its legal determinations de novo." *State v. Chute*, 908 N.W.2d 578, 583 (Minn. 2018).

The Fourth Amendment to the U.S. Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This protection extends to the curtilage of a person's house—the area "immediately surrounding and associated with the home." *Florida v.*

---

[3] We note that Lague characterized this procedure as a *Lothenbach* plea. "In 2007, Minn. R. Crim. [P.] 26.01, subd. 4, replaced *Lothenbach* as the method for preserving a dispositive pretrial issue for appellate review in a criminal case." *State v. Myhre*, 875 N.W.2d 799, 802 (Minn. 2016).

5

*Jardines*, 569 U.S. 1, 6 (2013) (quotation omitted). Accordingly, investigating law-enforcement officers may not enter curtilage. *United States v. Jones*, 565 U.S. 400, 406 n.3, 412 (2012); *Chute*, 908 N.W.2d at 586.

But not all law-enforcement intrusions into curtilage violate the Fourth Amendment. Homeowners impliedly invite members of the public to enter their curtilage and approach their house for numerous reasons. *Jardines*, 569 U.S. at 8 ("[T]he knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." (quotation omitted)). A police officer without a warrant can "approach a home and knock, precisely because that is no more than any private citizen might do." *Id.* (quotation omitted); *see State v. Crea*, 233 N.W.2d 736, 739 (Minn. 1975) ("[P]olice with legitimate business may enter areas within the curtilage of the home if those areas are impliedly open to the public.").

The concept of the implied license to enter private property is grounded in "habits of the country," which permit "the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8 (quotation omitted). Accordingly, it "includes all routes by which homeowners accept visitors to their property." *Chute*, 908 N.W.2d at 586. But the scope of an implied license must comply with purpose, space, and temporal limitations. *Id.* This means that while law enforcement may enter the curtilage of a home under this implied license, their "leave to gather information is sharply circumscribed." *Jardines*, 569 U.S. at 7. As the Supreme Court explained, "[c]omplying with the terms of that traditional

invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." *Id.* at 8.

Here, it is undisputed that the deputies entered the curtilage of Lague's house. The question is whether they had an implied license to do so and, if they did, whether they exceeded the scope of that implied license. Lague does not challenge the district court's underlying findings of fact. But he asserts that no private citizen would believe they can enter an area that is protected by a no trespassing sign without express consent. Alternatively, Lague argues that the deputies exceeded the scope of their implied license because they entered his property for the purpose of conducting a search. Neither argument persuades us to reverse.

I.    **The record supports the district court's determination that the driveway area where the deputies encountered Lague is impliedly open to the public.**

Lague argues that no one, not even emergency responders or a delivery person, has an implied license to enter his driveway. He contends that natural barriers (a tree line and pond) coupled with manmade barriers (his mailbox located near Bluejay Ave. and the two signs he posted along 7th St. NW) signal to all approaching citizens that they are not invited to enter the grassy area in front of his house. The record defeats his argument.

The photographs and videos show that 7th St. NW is not actually part of Lague's driveway; it is an unpaved public road that runs both east and west from his house. At least two other houses that Lague does not own are also located along 7th St. NW, and Lague's is not the only mailbox on the street. A person approaching Lague's house from the east, as the deputies did, would not encounter gates, fences, or any other physical barrier. The

7

no trespassing sign is posted on a public utility pole on the south side of 7th St. NW, approximately halfway between Lague's house and Bluejay Ave. Lague's house is on the north side of the street and is not visible from the utility pole's location. In short, nothing about the location or language of the no trespassing sign signals the precise area from which members of the public are excluded, let alone that this area encompasses Lague's house. And the video surveillance sign, albeit closer to and on the same side of the street as Lague's house, does not advise citizens that they may not enter (although it might suggest they should be on their best behavior when they do).[4]

Lague acknowledged during the suppression hearing that the unpaved driveway area the deputies entered is the same area that a fire truck or ambulance would use if they needed to access his house. But he now asserts that there is a "stark difference" between emergency fire and medical responders and other members of the public because there is "an unspoken assumption" that Lague would have called them first—an express invitation to enter his property—and the functions they perform broaden the scope of the invitation. We are not convinced. Persons other than Lague might summon emergency responders to his house. A family member, friend, neighbor, or community member could call for an ambulance, firetruck, or police car to go to Lague's residence for any number of reasons, and those emergency responders would have an implied license to enter his property from

---

[4] The district court cited *Michel v. State*, 961 P.2d 436 (Alaska Ct. App. 1998), and *United States v. Ventling*, 678 F.2d 63 (8th Cir. 1982), for the proposition that "a no trespassing sign alone is not sufficient to prevent entry" and negate an implied license. We need not adopt such a broad conclusion because, on this record, the no trespassing sign Lague posted does not notify citizens that they are unwelcome in the driveway adjacent to his front door.

7th St. NW, just as the deputies did here. And law-enforcement officers also assist the public in matters of safety and health. The fact that Lague did not expressly invite the deputies onto his property does not make their conduct a violation of his constitutional rights. *See Jardines*, 569 U.S. at 9 (stating that a license to enter property can be express or implied and has both area and purpose limitations).

On this record, we conclude that the record supports the district court's determination that the area where the deputies encountered Lague is impliedly open to the public.

## II. The deputies did not exceed the scope of the implied license to enter Lague's curtilage.

Alternatively, Lague argues that the deputies exceeded the scope of any implied license because they entered the curtilage of his house with the intent to conduct a warrantless search. This argument is unavailing.

The district court concluded that the deputies complied with the purpose, space, and temporal limitations outlined in *Chute*. The district court reasoned that the deputies acted within the scope of the implied license because they: (1) arrived at the residence to conduct legitimate police business (investigate a hit-and-run accident); (2) did not leave the area where they parked their vehicles (alongside other vehicles on the property); and (3) approached Lague's running vehicle out of concern for his well-being and appropriately extended their visit to conduct a DWI investigation upon observing Lague's behavior and smelling alcohol on his breath. We see no error in the district court's analysis.

9

The record, including the body-camera and squad-camera footage, shows that the deputies approached the front of Lague's house by the most direct means possible—his driveway. They did so in broad daylight, within minutes of the reported motor-vehicle accident. They did not wait until darkness fell to approach the house, venture into other parts of the property, or use a back entrance not customarily used by the general public. *See Chute*, 908 N.W.2d at 587-88 ("[A] visitor cannot traipse through the garden, meander into the backyard, or take other circuitous detours that veer from the pathway that a visitor would customarily use." (quoting *Jardines*, 569 U.S. at 19 (Alito, J., dissenting)). There is no evidence that the deputies were acting secretively or suspiciously. And to the extent Lague's arrest for DWI gave the deputies grounds to search the Porsche, they did not do so. *See State v. Bernard*, 859 N.W.2d 762, 768 (Minn. 2015). In short, the record persuades us that the deputies did not exceed the purpose, space, or temporal parameters of the implied license to enter Lague's curtilage.

In sum, the deputies had an implied license to enter the unpaved driveway area in front of Lague's house because it was impliedly open to the public. The deputies did not exceed the scope of the implied license; they talked with Lague near the front of his house about a motor-vehicle accident that had just occurred. Because doing so did not violate the Fourth Amendment, the district court did not err by denying the suppression motion.

**Affirmed.**